No. 24-70009

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

Roderick Napoleon Harris,
*Petitioner-Appellant,*

v.

ERIC GUERRERO, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,
*Respondent-Appellee.*

_____

Appeal from the United States District Court for
the Southern District of Texas, Houston Division,
Case No. 3:20-cv-03702-E, Hon. Ada Brown

_____

**MOTION FOR CERTIFICATE OF APPEALABILITY
AND INCORPORATED BRIEF IN SUPPORT**

_____

Gwendolyn C. Payton
John R. Neeleman
KILPATRICK TOWNSEND &
  STOCKTON LLP
1420 Fifth Ave., Suite 3700
Seattle, Washington 98101
(206) 626-7714

Adam H. Charnes
KILPATRICK TOWNSEND &
  STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
(214) 922-7106

*Attorneys for Petitioner-Appellant*
*Roderick Napoleon Harris*

## CERTIFICATE OF INTERESTED PERSONS

Case No. 24-70009, *Roderick Napoleon Harris v. Eric Guerrero, Director, Texas Department of Criminal Justice, Correctional Institutions Division.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges may evaluate possible disqualifications or recusal.

| | |
|---|---|
| Roderick Napoleon Harris<br>*Petitioner-Appellant* | Eric Guerrero<br>*Respondent-Appellee* |
| Gwendolyn C. Payton<br>Adam H. Charnes<br>John R. Neeleman<br>Kilpatrick Townsend<br>   & Stockton LLP<br>*Counsel for Petitioner-Appellant* | Molly Knowles<br>Office of the Attorney General<br>*Counsel for Respondent-Appellee* |

/s/ Gwendolyn C. Payton
Gwendolyn C. Payton
KILPATRICK TOWNSEND &
   STOCKTON LLP
1420 Fifth Ave., Suite 3700
Seattle, Washington 98101
(206) 626-7714

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Roderick Napoleon Harris respectfully requests oral argument for this Court to consider his application for a certificate of appealability ("COA"). The claims presented in this application are sufficiently legally and factually complex that oral argument would substantially aid this Court's consideration of this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT ..................................ii

TABLE OF CONTENTS ..........................................................................iii

TABLE OF AUTHORITIES ....................................................................vi

INTRODUCTION...................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 2

STATEMENT OF THE CASE................................................................... 2

I.    Procedural history. .......................................................................... 2

II.   The offense....................................................................................... 4

III.  The pre-trial proceedings. .............................................................. 4

IV.   Trial counsel failed to prepare for Harris's trial. .......................... 5

V.    The trial. ........................................................................................ 11

VI.   The State habeas proceeding........................................................ 14

      A.    Harris's mother told trial counsel she drank while
            pregnant, and trial counsel admitted they did not
            investigate. .......................................................................... 14

      B.    Harris's trial counsel knew that he was potentially
            exposed to lead poisoning, yet failed to investigate. ........... 15

      C.    Harris's MRI shows significant brain damage. ................... 17

      D.    Harris suffers from FASD..................................................... 18

      E.    Harris has brain damage from exposure to lead. ................ 20

F.    Harris's psycho-social history shows severe abuse and neglect. ................................................................20

G.    Harris did not belong to a gang. ...........................24

H.    Trial counsel's representation fell below professional norms in Texas. ...................................24

VII.  The State habeas adjudication. ....................................27

VIII. The district court's opinion. .........................................28

SUMMARY OF THE ARGUMENT .......................................29

STANDARD OF REVIEW .....................................................31

ARGUMENT .........................................................................36

I.    The District Court misapplied Supreme Court precedent holding that, absent investigation, courts may not defer to trial counsel's judgment. ................................36

A.    Trial counsel's failure to investigate Harris's brain damage caused by FASD and lead poisoning precludes deference to their "judgment." ..............................38

B.    Trial counsel's failure to investigate Harris's psycho-social history precludes deference to their "judgment." .......44

II.   The district court misapplied Supreme Court precedent in accepting trial counsel's post hoc justifications for their failures to investigate. ...................................................45

III.  The district court misapplied Supreme Court precedent in failing to apply professional norms in evaluating effectiveness of trial counsel. .........................................48

A.    The Supreme Court requires habeas courts to determine and apply professional norms. ..........................48

B.     The district court failed to apply or articulate any professional norms at all....................................................49

IV.   The district court misapplied *Jones* and *Strickland* when weighing aggravating against mitigating factors to determine prejudice........................................................54

V.    The district court misapplied Supreme Court precedent in finding that trial counsel was not deficient when he solicited testimony that Harris wore a stun belt during trial. ...................62

CONCLUSION .....................................................................69

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Allen v. Woodford,*
  395 F.3d 979 (9th Cir. 2005) ..............................................53

*Andrus v. Texas,*
  590 U.S. 806 (2020) .............................. 40, 41, 44, 54, 59, 60

*Bobby v. Van Hook,*
  558 U.S. 4 (2009) ......................................................48, 52

*Boone v. State,*
  230 S.W.3d 907 (Tex. App. 2007) .......................................64

*Bouchillon v. Collins,*
  907 F.2d 589 (5th Cir. 1990) ............................................34

*Buck v. Davis,*
  580 U.S. 100 (2017) .......................................................32

*Carter v. State,*
  506 S.W.3d 529 (Tex. App. 2016) .......................................67

*Clemons v. Mississippi,*
  494 U.S. 738 (1990) .......................................................57

*Cullen v. Pinholster,*
  563 U.S. 170 (2011) .......................................................51

*Deck v. Missouri,*
  544 U.S. 622 (2005) ..................................................62, 64

*Escamilla v. Stephens,*
  749 F.3d 380 (5th Cir. 2014) ............................................37

*Ex parte Gonzales,*
  204 S.W.3d 391 (Tex. Crim. App. 2006) ................... 55, 56, 58

*Ex parte Harris*,
No. WR-80,923-01, 2020 WL 8079824 (Tex. Crim. App. Dec. 16, 2020) ....................................................................................... 3

*Ex parte Van Alstyne*,
239 S.W.3d 815 (Tex. Crim. App. 2007) ............................................ 52

*Gonzalez v. Pliler*,
341 F.3d 897 (9th Cir. 2003) ............................................................ 65

*Hamilton v. Ayers*,
583 F.3d 1100 (9th Cir. 2009) .......................................................... 53

*Harrington v. Richter*,
562 U.S. 86 (2011) ............................................................ 46, 48, 53

*Held v. State*,
948 S.W.2d 45 (Tex. App. 1997) ....................................................... 50

*In re McCann*,
422 S.W.3d 701 (Tex. Crim. App. 2013) ........................................... 52

*Kyles v. Whitley*,
514 U.S. 419 (1995) ........................................................................ 62

*Marquez v. Collins*,
11 F.3d 1241 (5th Cir. 1994) ........................................................... 63

*Mendoza v. State*,
1 S.W.3d 829 (Tex. App. 1999) ........................................................ 64

*Miller v. Johnson*,
200 F.3d 274 (5th Cir. 2000) ........................................................... 32

*Miller-El v. Cockrell*,
537 U.S. 322 (2003) ........................................................................ 32

*Moore v. Texas*,
581 U.S. 1 (2017) ...................................................................... 53, 54

*Murphy v. Davis,*
    737 F. App'x 693 (5th Cir. 2018)...................................................44, 52

*Neal v. Vannoy,*
    78 F.4th 775 (5th Cir. 2023) .................................32, 33, 34, 38, 62, 63

*Penn v. State,*
    628 S.W.2d 179 (Tex. App. 1982).......................................................64

*Porter v. McCollum,*
    558 U.S. 30 (2009).........................................................................60, 61

*Rompilla v. Beard,*
    545 U.S. 374 (2005).............................................38, 39, 40, 41, 44, 52

*Shaw v. State,*
    846 S.W.2d 482 (Tex. App. 1993).......................................................64

*Slack v. Daniel,*
    529 U.S. 473 (2000)...........................................................................31

*State v. Choice,*
    319 S.W.3d. 22 (Tex. App. 2008).......................................................68

*State v. Hampton,*
    140 P.3d 950 (Ariz. 2006)..................................................................55

*Stephenson v. Neal,*
    865 F.3d 956 (7th Cir. 2017).......................................................65, 68

*Streber v. Hunter,*
    221 F.3d 701 (5th Cir. 2000).............................................................53

*Strickland v. Washington,*
    466 U.S. 668 (1984)................................................................. *passim*

*Stringer v. Black,*
    503 U.S. 222 (1992)...........................................................56, 57, 58

*Thornell v. Jones,*
  602 U.S. 154 (2024) .............................................. 30, 54, 55, 57, 58, 59

*United States v. Durham,*
  287 F.3d 1297 (11th Cir. 2002) ........................................... 65

*United States v. Owens,*
  724 F. App'x 289 (5th Cir. 2018) ......................................... 45

*Washington v. State,*
  362 So.2d 658 (Fla. 1978) ................................................ 57

*Wiggins v. Smith,*
  539 U.S. 510 (2003) ................................... 30, 36, 44, 46, 52

*Williams v. Stirling,*
  914 F.3d 302 (4th Cir. 2019) ....................................... 43, 44

*Williams v. Taylor,*
  529 U.S. 362 (2000) ................................................... 35, 36

*Wiseman v. State,*
  223 S.W.3d 45 (Tex. App. 2006) ......................................... 64

*Wood v. Allen,*
  558 U.S. 290 (2010) ...................................................... 34

*Woodford v. Visciotti,*
  537 U.S. 19 (2002) ....................................................... 62

## Statutes

Antiterrorism and Effective Death Penalty Act of 1996,
  28 U.S.C. §§ 2241-2255 ................................................. 32
  28 U.S.C. § 2253 ........................................................ 31
  28 U.S.C. § 2254 ......................................................... 2
  28 U.S.C. § 2254(d) ................................................. 32, 33
  28 U.S.C. § 2254(d)(1) ........................................ 32, 33, 34
  28 U.S.C. § 2254(d)(2) .................................................. 33
  28 U.S.C. § 2254(e)(1) ................................................. 34

Ariz. Rev. Stat. Ann. § 13-703(E) (1993)................................55

Fla. Stat. § 921.141................................................................57

Tex. Code Crim. Proc. art. 37.071, § 2(e)(1)..........................56

28 U.S.C. § 1291 ......................................................................2

28 U.S.C. § 1331 ......................................................................2

## Other Authorities

*ABA Guidelines for the Appointment and Performance of
  Defense Counsel in Death Penalty Cases,*
  31 Hofstra L. Rev. 913 (2003)....................25, 39, 43, 44, 49, 51, 52, 54

ABA Standards for Criminal Justice 4-4.1, commentary (2d ed.
  1980)................................................................................52

*Guidelines and Standards for Texas Capital Counsel,*
  69 Tex. B.J. 966 (2006) ........................................... 25, 49, 52

Appellant Roderick Napoleon Harris moves this Court to issue a certificate of appealability.

## INTRODUCTION

Before his capital murder trial, Roderick Harris's trial counsel learned that his then-17-year-old mother regularly drank while pregnant with Harris and that Harris has brain damage from lead poisoning, but they did not investigate further. Trial counsel also failed to investigate Harris's childhood and discover that he had been severely neglected and abused. As a result, the jury heard none of these critical mitigating circumstances. Counsel then elicited testimony revealing to the jury that Harris was wearing a stun belt—an unconstitutional disclosure that violated well-settled law.

The district court misapplied clearly established Supreme Court precedent in excusing trial counsel's neglect based on a "heavy measure of deference to counsel's judgments." Trial counsel could not have made a strategic judgment because they did not investigate to determine the facts about the possible mitigating circumstances. In the State habeas proceeding, Harris presented a compelling mitigation case that the jury never heard: Harris suffers from Fetal Alcohol Syndrome Disorder

(FASD), has severe brain damage from lead exposure and FASD, and was severely abused as a child. Had the jury known this information, and had it not heard the highly prejudicial stun-belt testimony, there is a reasonable probability it would not have sentenced Harris to death.

In these circumstances, the Court should grant the certificate of appealability.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Harris's habeas petition under 28 U.S.C. §§ 1331 and 2254. This Court has jurisdiction under 28 U.S.C. § 1291. The district court denied Harris's petition on November 5, 2024. ROA.463. Harris filed his timely notice of appeal on December 2, 2024, ROA.565, and then—after an extension of time, ROA.605— timely refiled his notice of appeal on February 14, 2025, Dkt. 59. This is an appeal from a final judgment that disposes of all parties' claims.

## STATEMENT OF THE CASE

## I.    Procedural history.

In 2012, a Dallas County jury found Harris guilty of capital murder and he was sentenced to death. ROA.463-66; ROA.473. In 2014, the Texas Court of Criminal Appeals (CCA) on direct appeal affirmed Harris's conviction and death sentence. ROA.473-74.

Harris filed a habeas corpus application in state court on June 11, 2014, asserting numerous ineffective assistance claims. ROA.474. The state habeas court held an evidentiary hearing, hearing testimony from multiple members of Harris's family, members of Harris's defense team (including his trial counsel, mitigation specialist, and court-appointed mental health expert), and many additional experts. ROA.474-75.

On March 31, 2020, the habeas trial court issued an order denying Harris's habeas application. ROA.475. On October 20, 2020, Harris filed objections to the trial court's order in the CCA. *Id*. The CCA denied Harris's state habeas application. *Ex parte Harris*, No. WR-80,923-01, 2020 WL 8079824 (Tex. Crim. App. Dec. 16, 2020).

Harris filed a habeas corpus petition in the district court on December 14, 2021, asserting claims that his trial counsel rendered ineffective assistance (1) by failing to investigate Harris's background adequately and present available mitigating evidence showing Harris suffered from (a) Fetal Alcohol Syndrome Disorder and (b) childhood exposure to toxic lead, and (2) by opening the door to testimony from a government witness that Harris wore a stun belt during trial. ROA.475. Harris also argued that:

the state habeas court improperly applied a preponderance of the evidence standard instead of an objective reasonableness standard in reviewing and rejecting Harris's ineffective assistance claims on the merits, and that the state habeas court wrongfully refused to employ a cumulative error approach to Harris's ineffective assistance claims (thereby implicitly requesting de novo review by [the district] court of his ineffective assistance claims).

ROA.476. The district court denied the petition and a certificate of appealability. *See* ROA.476, *et seq*.

## II. The offense.

The district court described the offense for which Harris was charged as follows:

On March 17, 2009, while committing an armed robbery and home invasion of the Gallardo family residence, Harris fatally shot Alfredo Gallardo and Gallardo's brother Carlos. During the robbery a member of the family managed to escape out a window and contact a security guard who notified police. After exiting the Gallardo home, Harris ignored calls from police to surrender, exchanged gunfire with multiple Dallas police officers who had surrounded the Gallardo home, and was struck by two bullets. He was immediately transported to a hospital and treated for his injuries.

ROA.463.

## III. The pre-trial proceedings.

Harris was indicted for the death of Alfredo Gallardo on March 17, 2009. Court-appointed attorneys Brad Lollar, Doug Parks, and Mike Howard represented Harris. Lollar was appointed lead counsel on April

1, 2009.  ROA.22616:17-24.  The State gave formal notice that it would seek the death penalty on August 24, 2009.  ROA.784.  Parks was appointed as second chair in June 2011.  ROA.22901:17-22902:4; ROA.21692-716.  Howard joined the team in September 2011 as third chair.  ROA.22785:8-14; ROA.22806:11-13; ROA.22809:5-7.

## IV.  Trial counsel failed to prepare for Harris's trial.

Lead counsel Lollar understood that the beginning of a case is the most critical time in preparing a defense, but he and the trial team did almost no work to prepare Harris's defense for nearly three years. ROA.22370:5-7.  Trial began on May 7, 2012.  ROA.22624:4-9.  Between Loller's appointment on April 1, 2009 and October 1, 2011, Lollar worked only 33 hours total—about 15 hours per year.  ROA.22616:17-24.

Lollar did not begin reviewing witness videos until the end of March 2012—fewer than two months before trial.  ROA.22623:6-12.  He did not review the record until the beginning of April 2012.  *Id.*  In the first two years after his appointment, Lollar spent only three hours with Harris. ROA.22625:14-22626:2.  He did not start an investigator working on the case until December 2010, when he retained investigator Brendan Ross,

and Antoinette McGarrahan, a neuropsychologist. ROA.22980:7-22981:1.

None of Harris's lawyers admits responsibility for developing the mitigation case. Lollar claimed attorney Howard was responsible for mitigation, though Howard denies it. ROA.22811:1-6; ROA.22814:16-24; ROA.21675-691. Howard spent even less time working on Harris's case before the start of voir dire—20.9 hours—a little over one hour of work per week. ROA.21675-691. Howard only spent 2.3 hours total meeting with Harris. *Id.*

Parks met with Harris for the first and only time on October 20, 2011, for only an hour-and-a-half. ROA.22901:17-902:19 ROA.21692-716. When voir dire started, Parks had only worked 21.9 hours on the case. ROA.22876:18-21; ROA.22902:9; ROA.21692-716. Trial was scheduled for May 7, 2012, and Parks began trial preparation on March 29, 2012, but then did no more work until April 9, 2012. ROA.22905:11-22.

In the two-year period after his appointment, Lollar spent only five hours consulting with his mitigation team, Ross and McGarrahan. ROA.22616:2-22617:17; ROA.21655-669. Ross understood that a

mitigation investigation must begin as soon as possible because "witnesses disappear," "memories fade," and "records get lost." ROA.22967:10-21. Yet Ross did not begin work until December 19, 2010, over a year after Harris's indictment and his attorneys were on notice that they needed to prepare a death-penalty mitigation case. ROA.22980:7-22981:1.

The trial team's investigator, Ross, admitted that preparation for the penalty phase of trial "requires extensive and generally unparalleled investigation into personal and family history." ROA.22967:22-22968:1. Yet the trial team did not create a social history for Harris. Ross admitted that the social history should have included any physical including sexual or emotional abuse, family history of mental illness, domestic violence, poverty, familial instability, neighborhood conditions, peer influences, traumatic events, and educational history. ROA.22968:14-18.

The trial team knew that Harris had been exposed in utero to alcohol and lead, but they did not investigate this as possible mitigation evidence. ROA.22876:13-25; ROA.22811:18-22. Lollar admitted that Harris's mother, Pamela Maddox, told him that she drank while

pregnant. ROA.21978:12-14; ROA.22377:16-22378:5. Trial counsel also knew that Harris and his mother had grown up next to the RSR lead smelter in Dallas, and that their home was a Superfund site and had been part of a massive environmental remediation due to toxic amount of lead in the soil and air. ROA.22381:8-22382:2. Counsel did not investigate Harris's lead exposure. ROA.22382:3-18.

McGarrahan did not work on the case until July 1, 2011, over two years after Harris's attorneys were on notice that they needed to prepare a death-penalty mitigation case. ROA.22703:12-19. Despite knowing that Harris's mother drank during pregnancy, trial counsel did not instruct McGarrahan to investigate whether Harris suffered from FASD. ROA.22379:2-14. McGarrahan was not qualified to make a FASD diagnosis, and had never done so. ROA.22699:23-22700:1; ROA.22812:13-22813:13; ROA.22706:15-19; ROA.22698:12-22699:1. Likewise, despite knowing about his significant lead exposure, trial counsel did not instruct McGarrahan to investigate whether Harris suffered from lead poisoning. ROA.22381:8-22382:2; ROA.22710:14-24.

McGarrahan performed some testing on Harris, which she admits showed neuropsychological deficits. ROA.22700:2-13; ROA.22744:3-12;

ROA.22748:14-16; ROA.22749:6-13; ROA.22750:24-22751:2;
ROA.22751:5-9. But she did not tell Harris's trial counsel her conclusions and possible testimony until a week after trial had already started. ROA.21852-853. Then, she wrote an email stating, for the first time, that she had nothing helpful to contribute at trial. *Id.*

Harris's counsel failed to investigate whether Harris had suffered from FASD and lead poisoning in utero and later even though they were aware of substantial evidence that Harris had brain damage. Harris's counsel were aware that Harris was in special education, public school records labeled him as having "Learning Disabilities/Emotional Behavior Disorders," he repeated a grade in elementary school, and dropped out in eleventh grade. ROA.22892:4-22896:13; ROA.22896:24-22897:18. Trial counsel had access to his school records, which show that he first started talking about killing himself as early as seven years old, a school psychologist diagnosed him with chronic depression, and he was diagnosed with ADHD. ROA.25328. As a child, Harris talked about hearing voices. ROA.22413:1-4. Yet trial counsel did not perform an MRI on Harris to determine whether he had brain abnormalities. ROA.22763:22-25.

Trial counsel failed to call an expert to address any of Harris's neuropsychological deficits. *Id.*; ROA.22906:23-22907:6. They did call three experts, but none were familiar with the record, interviewed any witnesses, or met Harris. ROA.20104; ROA.20137. They specifically denied being asked to render an opinion about Harris himself, and only provided generalized information. *Id.* Trial counsel did not prepare any of the expert witnesses to testify until after trial had already started, and then only for a de minimis amount of time. ROA.22906:23-22907:6. Parks did not meet with the defense expert Dr. Kessner, whom he put on the stand at trial, until May 16, 2012—nine days after trial had already started. *Id.* Parks did not meet with defense experts Jim Aiken and Frank AuBuchon until May 17, 2019—ten days after trial began. ROA.22907:7-22. Parks prepared these two experts together in one meeting for about an hour. *Id.*

Trial counsel learned before trial that the State intended to tell the jury Harris was a gang member and present expert testimony on how dangerous gang members are. ROA.1419. Trial counsel did not investigate the State's evidence, nor did they hire an expert to respond to it. ROA.9148:5-12; ROA.19157:18-19158:7.

## V. The trial.

In the punishment phase, the State called a police officer as an expert on gangs. ROA.19140; ROA.19148-149; ROA.19156; ROA.19157:18-19158:7; ROA.20749-750; ROA.20757-758; ROA.20761-762; ROA.20765-766; ROA.20769-770. The State introduced photographs of Harris's tattoos taken in April 2012, about three weeks before trial, claiming they proved that Harris was a member of a dangerous gang, the "Fish Trap Bloods." ROA.19157:18-19158:24. Harris's counsel did not object. *Id.*

The State called Deputy Sheriff Bobby Moorehead of the Dallas County Sheriff's Office. Deputy Moorehead was a bailiff during voir dire in Harris's trial. ROA.20219-220; ROA.20225-27. The State called Deputy Moorehead for the sole purpose of asking him to identify two drawings Harris made during voir dire. ROA.20219-220. His direct testimony was quick and the drawings were admitted without objection. *Id.*

On cross-examination, Harris's trial counsel deviated sharply from the scope of direct, telling Deputy Moorehead to "[g]o ahead and tell [the jury] about the elevator incident." ROA.20225. Deputy Moorehead then

testified that during voir dire, he and his partner were transporting Harris to the courtroom, exited the courthouse elevator, and accidentally left Harris unaccompanied inside when the doors closed. ROA.20225-27. The elevator soon returned without incident, with Harris and two court reporters who had boarded the elevator on another floor. *Id.* Harris's counsel then had Deputy Moorehead testify that Harris was wearing a stun belt:

> A. I placed a device on Harris called a RACC belt, R-A-C-C. That stands for remotely activated custody control devise. [sic] I had the control to the device. The device is capable—
>
> Q. Let me stop you there. That is a stun belt so in case they act up, you can zap them?
>
> A. Some people refer to it as a stun belt.
>
> Q. All right.
>
> A. It has the capability of shocking a person with approximately 75 to 85,000 volts zero amperage, but it does incapacitate the person that's wearing it.

ROA.20226.

Loller asked Deputy Moorehead to confirm that Harris had not attempted to escape while left alone on the elevator. ROA.20230:4-10. Deputy Moorehead confirmed but continued that "Roderick knew that I could stop him at any point. He had been

12

told what the belt would do and I don't think there was ever a doubt in his mind that I would activate it." ROA.20230:16-19.

Because Lollar had opened the door to the fact that Harris was wearing a stun belt, the State elicited a plethora of testimony about the stun belt on re-direct:

- Deputy Moorehead reminded Harris every morning for all twelve weeks of voir dire what the stun belt would do if activated. ROA.20231:11-20232:5. Deputy Moorehead or another bailiff controlled the stun belt's remote at all times. *Id.*

- Harris signed a form each morning acknowledging that he was aware of the stun belt's capabilities. *Id.*

- Deputy Moorehead testified that Harris told him that he thought Deputy Moorehead was going to shock him during the elevator incident. *Id.*

Trial counsel did not object to any of the State's redirect examination about the stun belt.

## VI. The State habeas proceeding.

During the state habeas proceeding, Harris presented a significantly different mitigation case that was available to trial counsel at the time of trial:

### A. Harris's mother told trial counsel she drank while pregnant, and trial counsel admitted they did not investigate.

Harris's mother drank Wild Irish Rose and Thunderbird "every weekend" during her first trimester.[1]  ROA.21978:8-11; ROA.22121:12-17.  Each of Harris's trial counsel testified that they were aware before the trial that Harris's mother drank alcohol while pregnant.  ROA.22377:16-22378:5; ROA.22811:19-22.  Lollar knew at the time of trial that there is no amount of alcohol that a pregnant woman can safely drink, especially in the first trimester.  ROA.22379:20-22380:5.

Yet Harris's trial counsel admitted that they did not investigate whether Harris might have FASD.  ROA.22876-877; ROA.22379:2-14.  They did not instruct McGarrahan (or anyone else) to investigate this.  ROA.22379:2-14.  They did not know whether McGarrahan was even

---

[1] Wild Irish Rose and Thunderbird are "typically fortified to alcohol by volume content of about 13 to 18 percent ... [and] substantially stronger than wine."  ROA.21978:8-11; ROA.22121:12-17.

qualified to diagnose FASD. ROA.22702:23-24; ROA.22812:13-22813:13. Trial counsel knew she had never diagnosed FASD. ROA.22706:15-19; ROA.22699:12-13. Nor is she an expert in FASD. *Id.* Yet Lollar testified that he relied on McGarrahan to tell him whether he should investigate FASD, and she did not. *Id.*

Trial counsel admitted that at the time of Harris's trial in 2012, it was well-known in the legal community that an FASD diagnosis was a mitigating factor that could have spared Harris a death sentence. ROA.22379:20-22380:5. McGarrahan also admitted that it was "well known in the community, and specifically the neuropsychological community, that any amount of alcohol can be problematic." ROA.22709:1-3.

Lollar conceded that, had he investigated and found evidence of FASD, he "would have put that on." ROA.22390:10-15.

**B.    Harris's trial counsel knew that he was potentially exposed to lead poisoning, yet failed to investigate.**

All of Harris's trial counsel knew that Harris grew up next to a Superfund-site lead car battery smelter in Dallas that closed in 1984, the year he was born. ROA.22381:8-22382:2; ROA.783; ROA.22223-224. Harris's mother lived approximately 2,000 feet downwind from the

operating smelter when she was pregnant with him. ROA.25305; ROA.21983:15-21984:8; ROA.21984:16-25. When she was pregnant, she ate the dirt in her yard. ROA.21984:16-25; ROA.22390:10-18.

In 1983, a court ordered the owner of the site to remove and replace contaminated soil, implement a comprehensive plan for remediation, and screen children for lead blood levels. ROA.25893. In 1984 and 1985, the government undertook extensive remedial work on the site, including the removal of contaminated soil. *Id.* In 1991, the EPA undertook a second removal effort. *Id.* In 1993, the EPA listed the site and surrounding area on the National Priorities List of Superfund Sites. *Id.*

Yet Harris's trial counsel did not hire a toxicologist to investigate whether Harris had brain damage from lead exposure. ROA.22382:3-18. Lollar admitted that had he investigated and found evidence that Harris suffered from lead exposure, he would have presented that evidence at trial. ROA.22390:10-18. He claimed he relied on McGarrahan to tell him whether he should investigate lead poisoning, and she did not. *Id.* He did not ask McGarrahan to investigate Harris's possible lead exposure, or whether she was qualified to do so. *Id.*

### C. Harris's MRI shows significant brain damage.

State habeas counsel had an MRI performed on Harris. ROA.27886. Dr. Travis Snyder, a neuroradiologist, evaluated the MRI and observed a cavum septum pellucidum, which is a space in the brain that ordinarily fuses shut when an infant develops normally. *Id.* A cavum septum pellucidum in an adult signifies abnormal fetal brain development. *Id.* Jeffrey David Lewine, Ph.D., a neuroscientist, explained that the MRI showed the brain was undersized: "Low volume were seen throughout the brain, but especially in temporal, parietal, and occipital regions, and also the left hippocampus. Low gray matter volume was additionally seen for bilateral cingulate regions." ROA.27888. Dr. Lewine correlated Harris's small brain size to prenatal and childhood exposures to toxins such as alcohol and lead. *Id.*

Joseph Wu, M.D., a professor emeritus of Psychiatry and Human Behavior at the University of California, Irvine, analyzed the MRI and concluded that Harris showed significant brain abnormalities that "corroborate the presence of a damaged brain most likely due to lead toxicity, traumatic brain injury and in utero exposure to alcohol." ROA.27924. With respect to alcohol exposure in particular, Dr. Wu

noted that Harris's brain size was abnormally small and had a "smaller caudate volume … consistent with [the] finding that patients with fetal alcohol spectrum disorder show that caudate is among the regions … most affected with approximately 16% volume reduction." ROA.27921.

### D. Harris suffers from FASD.

In his habeas proceeding, Harris presented testimony from multiple experts that he has FASD. Dr. Julian Davies, a pediatrician and expert in FASD at the University of Washington Fetal Alcohol Spectrum Diagnostic Clinic, diagnosed Harris with alcohol-related neurodevelopmental disorder (ARND), a form of FASD that has severe effects on executive function and cognitive abilities. ROA.22109:4-24; ROA.27950-55; ROA.27959-72.

Dr. Davies also studied Harris's childhood development and academic history, which presented:

> evidence of a complex pattern of behavior or cognitive abnormalities that are inconsistent with developmental level and cannot be explained by familial background or environment alone, such as learning difficulties; deficits in school performance; poor impulse control; problems in social perception; deficits in higher level receptive and expressive language; poor capacity for abstraction or metacognition; specific deficits in mathematical skills; or problems in memory, attention, or judgment.

ROA.27969-70.

Dr. Joan Mayfield is a Ph.D. in neuropsychology with a focus in children and has extensive experience diagnosing FASD. ROA.22485:20-22486:19. Dr. Mayfield testified that she reviewed the cognitive tests McGarrahan performed on Harris before trial, and that the results show significant impairment consistent with FASD. ROA.22480:3-21; ROA.22520:9-10; ROA.22535:5-22. For example, his performance on the Wisconsin Card Sorting Test McGarrahan administered shows significant neurocognitive deficits. ROA.22493:7-22494:13. Less than 1% of the population performs as poorly as Harris did. *Id.* The 15-point discrepancy between Harris's verbal IQ and performance IQ scores—the IQ "split"—is a significant red flag for FASD. ROA.22498:13-22499:7; ROA.22535:5-22. Harris's performance when McGarrahan administered the Wechsler Memory Scale, the California Verbal Learning test, and the Rey-Osterrieth test showed significant evidence of FASD, as did his significant short-term memory deficits displayed by the test results. ROA.22535:5-22; ROA.22501:5-22502:1. Dr. Mayfield concluded that the tests that McGarrahan herself performed pointed to FASD.

ROA.22494:11-22496:21; ROA.22503:4-22504:1; ROA.22518:4-22519:6; ROA.22499:22-22501:1.

### E. Harris has brain damage from exposure to lead.

Harris called Thomas Dydek, Ph.D., a toxicologist, who testified about Harris's high levels of exposure to lead in utero and as a child. ROA.22209:7-22210:6; ROA.22226:20-22227:24; ROA.22210:11-12; ROA.25307. Dydek explained how fetuses in utero absorb lead from their mother. ROA.22209:7-22210:6. Habeas counsel had Harris's mother tested for lead contamination on October 23, 2018 at the Icahn School of Medicine at Mount Sinai Hospital in New York. The test showed that her bone-lead concentration was "approximately 30% greater than the average of the predictions of the concentration expected for someone her age." ROA.27878. Texas refused to allow Harris to be transported for the same test. ROA.22465:17-22466:15.

### F. Harris's psycho-social history shows severe abuse and neglect.

Habeas counsel retained Dr. Laura Sovine, a clinical social worker and social historian from the University of Texas, and she developed a psycho-social history for Harris. ROA.21981:20-21; ROA.22069:4-15; ROA.22653:1-3; ROA.25380. Her investigation uncovered that Harris

was born in West Dallas to impoverished parents who abused alcohol and drugs, engaged in domestic violence, and suffered from mental illness. ROA.25406; ROA.21981:20-21; ROA.22653:1-3. Harris's mother has bipolar disorder and was hospitalized three times for mental health issues. *Id.* Harris's biological father, Eric Propes, has schizophrenia. *Id.*

Harris's mother gave birth to Harris at seventeen after drinking alcohol and smoking marijuana during her pregnancy. ROA.21977:19-21; ROA.25382. After his birth, his mother frequently left Harris with "a rotating cast of caregivers," "while she partied and struggled with her own mental health" and was "incapable of bonding with [Harris] ... paying very little attention to him" and "struggling to connect." ROA.25385; ROA.22654:7-12. His mother did not "show much affection" to Harris; she did not hug him or tell him she loved him. ROA.22769:15-22. She "knew [she] had a baby," "but it wasn't real" to her. ROA.21979:16-18. She did not give attention to Harris as a baby and as a child. *Id.* Dr. Sovine testified to the importance of attachment and bonding to a primary caregiver for a baby's brain development. ROA.22654:14-18. She testified that this vital attachment did not happen for Harris. ROA.22655:3-13.

Harris's biological father went to prison shortly after Harris was born. ROA.25386; ROA.35469. When Harris was three years old, his mother married Ramon Maddox. Maddox physically abused him. ROA.25393. He frequently beat Harris, usually with a belt or extension cord. He sexually abused Harris. *Id.*; ROA.22766:10-16; ROA.21988:24-21989:9; ROA.21991:7-21992:13.

As a child, Harris regularly witnessed Maddox physically abuse his mother, whom Maddox frequently beat and raped. ROA.21990:1-5, 21-25; ROA.22767:1-4; ROA.25387; ROA.22767:5-8. The police were called to the Maddox home at least fifteen times. *Id.* Ms. Maddox would often flee to her sister's home bruised and bloody. *Id.*

Early in life, Harris showed many of the hallmark cognitive deficits and disabilities that happen when a child is exposed to alcohol and lead in utero. ROA.25388. Public school records identify him as having "Learning Disabilities/Emotional Behavior Disorders." ROA.25403; ROA.25673-886. He was in special education classes until he dropped out of high school in eleventh grade. *Id.*

Starting at age seven, Harris repeatedly talked about killing himself. ROA.22420:18-22421:5. He reported hearing voices as a child.

ROA.22413:5-7; ROA.22771:4-6. He received no psychiatric care or medication. ROA.22420:11-22421:13; ROA.22413:13-16. He was diagnosed with ADHD but his parents did not allow him to take medications. ROA.25328.

By high school, Harris self-medicated with illegal drugs. ROA.25334-35. When Harris was arrested for marijuana possession, the arrest report noted that "suitable supervision, care, or protection not provided by parent, guardian, custodian, or other person." ROA.25400-401.

Harris struggled to make friends and was frequently bullied and teased. ROA.22130:8-22131:20; ROA.22768:17-22769:6. When sixteen, he self-reported as having "0 friends." ROA.27553. Harris's parents and teachers treated his difficulty learning and depression as deviance and rule-breaking rather than as signs of cognitive impairment. ROA.25394. As he grew older, Harris's mother and stepfather disciplined him even more harshly, and he started to run away from home. ROA.25394.

Harris preferred jail to living in his abusive home. Harris was placed in detention at an emergency shelter, and he told his probation

officer he wanted to be locked up rather than returned home. Harris dropped out of school before completing Eleventh grade and became homeless. ROA.22674:8-11; ROA.25404.

## G. Harris did not belong to a gang.

At trial, the State told the jury that Harris was in a gang based on one of his tattoos. The State's expert testified about how dangerous gang members are to society. Harris's trial counsel offered no rebuttal.

Had trial counsel investigated, they would have learned that Harris obtained the tattoos long after he was incarcerated. A photo of Harris in counsel's file, taken May 12, 2009, right after Harris's arrest three years before trial, shows Harris without the tattoo. ROA.27485.

An investigation would also have disclosed that Harris's family denied he ever belonged to a gang, and that his juvenile record repeatedly states that Harris had no gang affiliation. ROA.27489.

## H. Trial counsel's representation fell below professional norms in Texas.

At the habeas hearing, Harris argued that all attorneys are bound by the prevailing professional norms specific to death penalty representation. These norms are documented in the ABA and Texas Guidelines. Under prevailing norms for capital counsel and these

guidelines, counsel must conduct "thorough and independent investigations relating to the issues of both guilt and penalty." *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (2003) ("ABA Guidelines")*,* Guideline 10.7; *Guidelines and Standards for Texas Capital Counsel*, 69 Tex. B.J. 966 (2006) ("Texas Guidelines"), Guideline 11.1 (same).

Harris called a capital-defense standard-of-care expert to establish the professional norms in Texas at the time of Harris's trial. Richard Burr has 40 years of experience representing clients sentenced to death in Texas. ROA.22938:14-17; ROA.23005:1-12.

Burr testified that trial counsel's failure to investigate whether Harris suffered from FASD, lead poisoning, and brain damage, and whether he belonged to a violent gang, fell below professional norms at the time of trial. ROA.23012:23-23013:3; ROA.23015:22-23016:6; ROA.23018:10-23020:2; ROA.23020:3-23021:1. Burr explained that "[p]renatal exposure to alcohol for many years, well before 2009, has been a big red flag." ROA.22382:3-18. For a client with a history of prenatal exposure to alcohol, a capital defense attorney must fully investigate the

possibility of FASD as mitigating evidence and Burr would have done so here. *Id.*

Even if a neuropsychological exam "doesn't show much," a reasonable capital defense attorney must "keep looking, because that doesn't negate having fetal alcohol disorder, especially if you have certain exposure over a period of time during the first trimester, which is when the brain is forming." ROA.23020:3-23021:1. "If ... counsel is on notice that the defendant is living for a significant amount of time in a Superfund site that has been found to have toxic levels of lead," then he has "a duty under the prevailing norms to investigate that exposure." ROA.23035:11-17. He further testified:

> [B]y 2009, the death penalty defense community had known for quite some time that exposure to environmental toxins— and the most prevalent environmental toxin is lead, especially for poor people who grow up where there's lead-based paint in housing projects that has flaked off and gotten into the soil, that type of exposure can be harmful, much less living in the shadow of a Superfund lead smelter site.

ROA.23035:19-23036:1.

Burr testified that retaining a gang expert is "essential" because gang membership is "one of the highest impact facts there is." ROA.23046:20-23047:2. "[T]he mere mention of it gives rise to the fear

and stereotyping that we all know is associated with it." *Id.* Burr also addressed trial counsel's failure to investigate whether Harris's tattoos were related to gang membership. ROA.23045:24-23046:15. The evidence showed that Harris got the tattoos in jail after his arrest and did not belong to a gang. Burr testified that prevailing professional norms would require trial counsel to investigate whether Harris acquired gang-related tattoos later, and why this occurred. *Id.*

## VII. The State habeas adjudication.

After Harris presented his live evidence, the presiding judge left the bench before ruling. A new judge, who did not hear any testimony, signed the State's proposed findings of fact and conclusions of law verbatim, except for deleting language that said the findings were based on the court's "personal knowledge and experience." ROA.322-33. The new judge did not hold any hearings or arguments. *See* ROA.21934, *et seq.*

The CCA affirmed the trial court and adopted its findings and conclusions.

## VIII. The district court's opinion.

The district court concluded, based on the "heavy measure of deference to counsel's judgments," that trial counsel's explanations in the state habeas proceeding excused their undisputed failure to investigate potentially mitigating evidence that Harris suffered from FASD and had brain damage from lead poisoning. ROA.463-535. Likewise, the district court excused the unconstitutional testimony that Harris wore a stun belt. The district court stated that trial counsel had exercised judgment in eliciting testimony that Harris wore a stun belt notwithstanding that countless cases hold that shackling a defendant in the jury's presence violates due process. *Id.*

The district court purported to review the state courts' findings under deferential and de novo review standards, in separate parts of the opinion. The district court conducted its de novo review in response to Harris's objection that the state habeas court applied a preponderance standard instead of an objective reasonableness standard as required by Supreme Court precedent and that the state habeas court wrongfully refused to employ a cumulative error approach to Harris's ineffective assistance claims. *Id.*

## SUMMARY OF THE ARGUMENT

Trial counsel admitted they were aware of evidence suggesting that Harris may be disabled by FASD and lead poisoning. They claimed that they did not investigate any of these mitigating circumstances based on an expert's advice received a week after trial began. But they knew that the expert was not competent to investigate or diagnose FASD or lead poisoning, and by the time they obtained input from her, it was too late to test her conclusion.

The evidence that Harris's habeas counsel developed and presented in the state habeas proceeding reveals the mitigation evidence that trial counsel could—and should—have offered during the penalty phase: Harris suffers from FASD, has brain damage from lead exposure and FASD, and was severely abused as a child. Had the jury known these facts, there is a reasonable probability it would not have sentenced Harris to death.

Any competent lawyer would and should have investigated and used at trial the facts that habeas counsel developed.

The district court found that, even though trial counsel failed to investigate, their performance was nonetheless adequate based on a

"heavy measure of deference to counsel's judgments." ROA.463-535. But trial counsel's decisions are not "strategic" if counsel never even investigated what evidence was potentially available in the first place. *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). How can counsel make a strategic decision not to present evidence if he does not even know what the evidence is? It is one thing to decide not to present evidence you know about, but a completely different thing not to present evidence you made no effort to find.

The district court also incorrectly held that trial counsel's deficiencies did not prejudice Harris. Here, the district court misapplied *Thornell v. Jones*, 602 U.S. 154 (2024). *Jones* held that in assessing mitigating evidence, a habeas court must apply the governing state-law framework for weighing aggregating factors against mitigating factors. But in applying *Jones*, which involved an Arizona defendant, the district court failed to appreciate the relevant differences between Arizona and Texas law. In contrast to Arizona, Texas's capital sentencing law does not directly weigh statutory aggravating and mitigating factors. Texas's scheme is more favorable to defendants because once the jury finds the presence of a single aggravating factor that supports consideration of the

death penalty, the jury may consider only mitigating factors. The district court thus erred by concluding that aggravating factors would have certainly cancelled out the new mitigating evidence offered by habeas counsel. Moreover, under Texas's scheme, only the jury can decide whether the new mitigating factors developed by habeas counsel would weigh against a death penalty.

Finally, the district court also erred in finding that counsel was not deficient when they introduced evidence that Harris wore a stun belt at trial. Countless cases hold that shackling a defendant in the jury's presence violates due process.

## STANDARD OF REVIEW

To receive a COA, a habeas petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. Daniel*, 529 U.S. 473, 484 (2000). "It is consistent with [28 U.S.C.] § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and

the case has received full consideration, that petitioner will not prevail." *Miller-El v. Cockrell*, 537 U.S. 322, 337-338 (2003); *see also Buck v. Davis*, 580 U.S. 100, 117 (2017) (same). "Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination." *Miller v. Johnson*, 200 F.3d 274, 280-81 (5th Cir. 2000).

Moreover, this Court must apply the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. §§ 2241-2255 "After the state court adjudicates the claim, the prisoner must overcome 'the relitigation bar imposed by AEDPA.'" *Neal v. Vannoy*, 78 F.4th 775, 782-83 (5th Cir. 2023) (citing 28 U.S.C. § 2254(d)(1)). This Court has explained the "two-step approach" under which it determines whether a habeas applicant has overcome the ADEPA's "relitigation bar." *Neal*, 78 F.4th at 782-83. "To overcome AEDPA's relitigation bar, a prisoner's claim must satisfy one of its narrow exceptions, listed in Section 2254(d)." *Id.* The claim must show that decision was either (1) "contrary to" or an "unreasonable application of" clearly established federal law, as determined by the decisions of the Supreme Court, or (2) based on an "unreasonable determination of the facts" presented in the state-court

proceeding. *Id.* (quoting 28 U.S.C. § 2254(d)). Additionally, "'a determination of a factual issue made by a state court shall be presumed to be correct,' and '[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'" *Id.* at 783.

The factual predicates that Harris relies on to allege ineffective assistance of counsel here are not in dispute: it is not disputed that trial counsel failed to investigate whether Harris suffered brain damage from FASD or lead poisoning, or that he elicited testimony that Harris wore a stun belt. The issue for each claim is one of mixed fact and law: whether trial counsel's alleged deficient performance was based on reasonable trial strategy. "[W]hether trial counsel's decision was based on a reasonable trial strategy presents mixed questions of law and fact and is reviewed using a combination of Sections 2254(d)(1) and (d)(2)." *Id.* at 786. "In evaluating state court findings of 'strategy,' the Supreme Court has stated a federal court must consider both '[w]hether the state court reasonably determined that there was a strategic decision under § 2254(d)(2)' and 'whether the strategic decision itself was a reasonable exercise of professional judgment under *Strickland* or whether the

application of *Strickland* was reasonable under § 2254(d)(1).'" *Id.* (quoting *Wood v. Allen*, 558 U.S. 290, 304 (2010)).

Here, for the reasons discussed below, Harris in the State habeas proceeding offered evidence sufficient to rebut the State courts' and the district court's finding of reasonable strategy by clear and convincing evidence under § 2254(e)(1).

"Even if [Harris] can satisfy AEDPA's exceptions to the relitigation bar, however, he must still meet the exacting requirements in *Strickland v. Washington*." *Id.* at 789. As shown below, Harris offered evidence in the State court that met those requirements.

With respect to the prejudice prong of Strickland's requirements, the Court must review de novo the state court's findings of fact because the state court applied the wrong burden of proof for prejudice—a preponderance of the evidence standard rather than the "reasonable probability" standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* mandates that the "proper measure of attorney performance remains simply reasonableness under prevailing professional norms," which is a less onerous burden than preponderance of the evidence. *Id.* at 694; *see also Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990)

(explaining that the prejudice prong imposes "a lower burden of proof than the preponderance standard" and that even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard.").

In *Williams v. Taylor*, 529 U.S. 362, 406-06 (2000), the Court held that a state-court decision that fails to apply the "reasonable probability" standard of *Strickland* and instead applies a "preponderance of the evidence" standard for prejudice is contrary to clearly established federal law. Here the district court alternatively applied both deferential and de novo review in response to Harris's objection that the state courts improperly applied a preponderance standard, and that the state habeas court wrongfully refused to employ a cumulative error approach to Harris's ineffective assistance claims. ROA.463-535. Thus, this Court cannot defer to the state court's findings and must review them de novo because there are no state findings based on the proper burden of proof to which this Court could defer.

# ARGUMENT

## I. The District Court misapplied Supreme Court precedent holding that, absent investigation, courts may not defer to trial counsel's judgment.

*Wiggins v. Smith*, 539 U.S. 510, 523 (2003), held that the courts should afford deference to trial counsel's judgment only if counsel conducted a reasonable investigation. As the Court explained, "the Maryland Court of Appeals ... unreasonably applied *Strickland*" by "deferring to counsel's decision not to present every conceivable mitigation defense despite the fact that counsel based their alleged choice on an inadequate investigation." *Id*. at 512.

Where counsel failed to investigate issues that could affect the jury's decision to impose a death sentence, the petitioner is entitled to relief. *Williams*, 529 U.S. at 372-73. Absent investigation, the courts will not defer to trial counsel's decisions. *Id*. In *Williams*, the Supreme Court reversed the denial of habeas relief because, as here, trial counsel failed to investigate Williams's childhood: "even if counsel neglected to conduct such an investigation at the time as part of a tactical decision ... tactics as a matter of reasonable performance could not justify the omissions." *Id*. at 373. As the Court emphasized, "if a purportedly tactical decision is

not preceded by a reasonable investigation, then it is not sufficiently informed and not entitled to the deference typically afforded counsel's choices." *Escamilla v. Stephens*, 749 F.3d 380, 392 (5th Cir. 2014). This Court has rejected "any suggestion that a decision to focus on one potentially reasonable trial strategy [i]s 'justified by a tactical decision' when 'counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background[.]'" *Id.*

Here, the district court made cursory references to trial counsel's judgment, asserting that their decisions were "informed" and "strategic" and were made following "objectively reasonable investigation into Harris's background," and "consultation with the defense's experienced mental health expert, Dr. McGarrahan." ROA.515. These perfunctory generalizations directly conflict with the record: trial counsel failed to investigate critical issues in Harris's life that would have affected the jury's decision to sentence him to death. Trial counsel failed to investigate or engage qualified experts to pursue issues they admit they were on notice of: FASD, lead poisoning, and extreme physical and sexual abuse from his stepfather.

**A. Trial counsel's failure to investigate Harris's brain damage caused by FASD and lead poisoning precludes deference to their "judgment."**

Harris's lead trial counsel admitted that, had he known Harris suffered from FASD and lead poisoning, he would have presented the evidence to the jury. But he was unaware because he did not investigate. This is reason enough for this Court to reverse. "A reviewing court must determine not only whether counsel made a strategic decision, but also whether that decision was reasonable based on the investigation that preceded it: 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Neal*, 78 F.4th at 790 (quoting *Strickland*, 466 U.S. at 690–91). Here trial counsel neither made a strategic decision not to investigate whether Harris suffered from brain damage from FASD or lead poisoning, nor was there any reasonable investigation preceding any purported strategic decision. Harris is entitled to relief on either basis.

In *Rompilla v. Beard*, 545 U.S. 374, 390-93 (2005), the Court reversed a death sentence because, although trial counsel claimed that they made tactical decisions based on reasonable investigation, the Supreme Court concluded that they had not investigated enough. Trial

counsel had failed to review the file on Rompilla's prior conviction, which revealed leads for mitigation evidence including his difficult childhood in urban poverty, his parents' and his own alcoholism, possible FASD, and test results that showed mental illness and limited cognition. *Id.* at 390-92. The Court acknowledged that under *Strickland*, it must give a "heavy measure of deference to counsel's judgments," but there could be no deference to judgment where counsel failed to investigate. *Id.* at 381, 392.

> As the Court pointed out:
>
> the American Bar Association Standards for Criminal Justice in circulation at the time of Rompilla's trial describes [trial counsel's] obligation [to investigate] in terms no one could misunderstand in the circumstances of a case like this one: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."

*Id.* at 387. "The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Id.* at 387 n.7 (emphasis in original). The Court concluded that "no such further investigation was needed to point to the reasonable duty to look in the

file in question here." *Id.* Likewise, here, trial counsel did not need to investigate further to decide to investigate whether Harris suffered from FASD. This case is virtually identical to *Rompilla*.

The district court acknowledged that Harris's state habeas counsel presented abundant mitigating evidence, but dismissed it entirely based on deference to trial counsel's professional judgment: "The fact that Harris's state habeas counsel identified new experts willing to furnish different etiologies (FASD/ARND and lead poisoning) for Harris's ADHD, learning difficulties, and propensity for violence as an adult does not mean there was anything professionally deficient about the investigation undertaken by Harris's trial team." ROA.515.

But the district court failed to address whether trial counsel had any excuse for failing to conduct the same investigation as habeas counsel undertook that yielded the mitigating evidence. In *Andrus v. Texas*, 590 U.S. 806, 814 (2020), the Court reiterated that "to assess whether counsel exercised objectively reasonable judgment under prevailing professional standards, we first ask whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Andrus's] background was itself reasonable." The Court reversed because trial counsel had not

conducted any investigation, and therefore his decision not to offer mitigating evidence deserved no deference. *Id.* "Despite repeated questioning, counsel never offered, and no evidence supports, any tactical rationale for the pervasive oversights and lapses here. Instead, the overwhelming weight of the record shows that counsel's 'failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment.'" *Id.* at 816-17.

As in *Andrus*, counsel provided ineffective assistance when they "abandoned [their] investigation of [Harris's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* As here, in *Andrus*, "counsel 'ignored pertinent avenues for investigation of which he should have been aware,' and indeed was aware.... Yet counsel disregarded, rather than explored, the multiple red flags.... The untapped body of mitigating evidence was, as the habeas hearing revealed, simply vast." *Id.* (cleaned up).

*Rompilla* and *Andrus* control this case. The district court improperly deferred to counsel's judgment where they failed to investigate, even ignoring professional norms offered by Harris. Had Harris's trial counsel been reasonably diligent, they would have discovered

the same mitigating evidence as habeas counsel offered. All trial counsel knew that Harris's mother drank while pregnant and grew up next to a lead smelter that was a Superfund site. ROA.22876-877; ROA.22811:19-22; ROA.22381:8-22382:2. Had trial counsel been more diligent in their questioning and consulted qualified experts, they would have discovered the mitigating evidence that habeas counsel uncovered.

Harris's trial counsel admitted that they did not investigate whether Harris might have FASD, nor did they instruct McGarrahan (or anyone else) to investigate this. ROA.22876-877; ROA.22811:19-22; ROA.22379:2-14. The district court attempts to excuse this by claiming that "Harris has alleged no specific facts and presented no evidence showing it was objectively unreasonable for his trial counsel to rely on the information and opinions furnished by Dr. McGarrahan." ROA.515. But this is wrong: "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691. Trial counsel did not know whether McGarrahan was even qualified to diagnose FASD, and she was not. ROA.22699:23-24; ROA.22812:13-22813:13. Trial counsel knew she had never diagnosed FASD and was not an expert in

FASD. ROA.22706:15-19; ROA.22699:12-13. Yet counsel wholly relied on McGarrahan to tell them whether they should investigate FASD, and she did not. *Id.* As trial counsel each admitted, at the time of Harris's trial, it was well-known in the legal community that an FASD diagnosis was a mitigating factor that could have spared Harris a death sentence. ROA.22379:20-22380:5. Lollar knew at the time of trial that there is no amount of alcohol that a pregnant woman can safely drink, especially in the first trimester. *Id.* Likewise, FASD is "widely acknowledged to be a significant mitigating factor that reasonable counsel should have at least explored—as outlined in the ABA Guidelines and caselaw at the time." *Williams v. Stirling*, 914 F.3d 302, 315 (4th Cir. 2019).

The district court denied Harris habeas relief on the principle of complete deference to trial counsel's decisions—even though trial counsel did not even undertake to investigate the mitigating evidence offered by habeas counsel. Trial counsel admit they did not investigate the mitigating evidence Harris's habeas counsel found, including evidence of Harris's FASD and brain damage, and they admit they would have presented such evidence if they had uncovered it. ROA.22390:10-15.

Here, as in *Williams*, *Rompilla*, *Wiggins*, and *Andrus*, trial counsel are not entitled to deference because they did not investigate.

## B.    Trial counsel's failure to investigate Harris's psycho-social history precludes deference to their "judgment."

Trial counsel failed to develop a psycho-social history of Harris's life.  The district court never addressed this failure.  And whether or not the trial team uses an expert to present the psycho-social history, they must develop one and present it through lay or fact witnesses.  *See ABA Guidelines*, Guideline 10.11 cmt. (noting the importance of presenting "the client's complete social history" at punishment).

There is no question that at the time of Harris's trial in 2012, it was a professional norm for trial counsel to develop a psycho-social history of a criminal defendant, with help from an expert.  In 2003, *Wiggins* noted, "standard practice in Maryland in capital cases at the time of Wiggins' trial included the preparation of a social history report."  539 U.S. at 524. As this Court has noted, immediately after *Wiggins*, all courts explicitly recognized preparation of a psycho-social history was a professional norm.  *Murphy v. Davis*, 737 F. App'x 693, 705 (5th Cir. 2018); *see also Wiggins*, 539 U.S. at 517 ("[A]t the close of the [habeas] proceedings, the judge observed from the bench that he could not remember a capital case

in which counsel had not compiled a social history of the defendant, explaining, '[n]ot to do a social history, at least to see what you have got, to me is absolute error.'").

Moreover, trial counsel knew that the State would offer testimony that Harris belonged to a violent gang, including expert testimony "interpreting" his tattoos. Courts recognize gang evidence is highly prejudicial, and they severely restrict use of gang evidence at trial. *See, e.g., United States v. Owens*, 724 F. App'x 289, 299 (5th Cir. 2018) (evidence of gang membership is only allowed where it goes to some specific permissible purpose; for instance, where gang membership demonstrates involvement in the alleged conspiracy). Yet trial counsel did not investigate and therefore discover that the State's gang evidence was false. If they had investigated, they would have discovered that Harris has no gang history, and he received the allegedly incriminating tattoo long after the crime at issue.

## II. The district court misapplied Supreme Court precedent in accepting trial counsel's post hoc justifications for their failures to investigate.

The district court cited trial counsel's post hoc justifications to support its deference to their judgment in failing to investigate. But the

Supreme Court prohibits reliance on post hoc rationalizations. *Wiggins*, 539 U.S. at 526-27 ("[T]he 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a post hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing."). *Strickland* "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington v. Richter*, 562 U.S. 86, 105, 110 (2011).

The district court reasoned that trial counsel's failure to investigate was justified by "evidence presented during Harris's state habeas proceeding showing there was substantially more aggravating evidence potentially available to the prosecution which Harris's trial counsel endeavored to conceal from the prosecution," including: "Dr. McGarrahan and Harris's trial counsel testified that they were concerned Harris's tendency to exaggerate his mental health symptoms (as demonstrated by his jail mental health records) might be construed by [State's expert Dr. Christine Reed] as a form of malingering"; "Harris's defense team was also concerned that, by presenting a mental health expert at trial who had evaluated Harris, the defense might open the door

to a new mental health evaluation by a prosecution expert (such as Dr. Reed)"; "[t]he defense feared that such an evaluation could reveal Harris's admissions that he had engaged in multiple additional bad acts and result in the jury hearing a diagnosis of ASPD [Antisocial Personality Disorder]"; "Dr. McGarrahan informed his defense counsel that she was concerned Harris would be diagnosed with ASPD. In fact, Dr. Reed did diagnose Harris with ASPD, a diagnosis confirmed by Dr. Falkowski." ROA.516. In other words, they now claim they did not investigate because they were concerned that investigation might uncover something bad.

This is nothing but post hoc rationalization that cannot possibly excuse their failure to investigate. Counsel could not have weighed the potential harm caused by Dr. Reed's testimony against the benefit of mitigation evidence because they did not investigate whether Harris suffered brain damage, FASD, and lead poisoning. *Id*. The district court's reasoning leads to the absurd conclusion that trial counsel should never investigate evidence of brain damage because it could be a two-edged sword. But counsel cannot justify failing to investigate because it might uncover something they do not like. The Supreme Court has

warned courts not to "indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *Harrington*, 562 U.S. at 109.

## III. The district court misapplied Supreme Court precedent in failing to apply professional norms in evaluating effectiveness of trial counsel.

### A. The Supreme Court requires habeas courts to determine and apply professional norms.

*Strickland* requires habeas courts to identify whether trial counsel's representation "fell below an objective standard of reasonableness." 466 U.S. at 688. Objective standards of reasonableness are the "professional norms" prevailing in the time and place of the trial. *See id.* "It is the responsibility of the courts to determine the nature of the work that a defense attorney must do in a capital case in order to meet the obligations imposed by the Constitution…." *Bobby v. Van Hook*, 558 U.S. 4, 14 (2009) (Alito, J., concurring). The courts must identify objective evidence of prevailing norms to ensure that courts undertake "an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington*, 562 U.S. at 105, 110.

Here, the district court failed to identify *any* objective standards of reasonableness. The district court did not determine whether trial

counsel's performance was deficient by measuring their representation against "prevailing professional norms" in trial counsel's locale at the time of trial, as required by *Strickland*.

## B. The district court failed to apply or articulate any professional norms at all.

In *Strickland,* 466 U.S. at 688, the Cout held that habeas courts must identify whether the representation "fell below an *objective* standard of reasonableness," which is the "professional norms" prevailing in the time and place of the trial. Harris offered the ABA Guidelines, the Texas Guidelines, and expert testimony as evidence of professional norms. ROA.499; ROA.28589. The district court rejected the ABA Guidelines, summarily concluding that "those recommendations for the performance of trial counsel do not set forth the operative standard of judicial review for the performance of trial counsel." *Id*.

Harris presented the testimony of a legal standard of care expert, Richard Burr, who testified to the prevailing standards of care among local criminal defense counsel in Texas defending capital cases. ROA.488. Burr testified how trial counsel's performance fell below prevailing professional norms. *Id*. Once trial counsel became aware that Harris's mother drank while pregnant and that she and Harris were

exposed to lead their entire lives, trial counsel should have fully investigated. *Id.* Habeas counsel undertook such an investigation, and discovered that Harris has FASD and brain damage from lead poisoning. Burr explained that evidence such as habeas counsel discovered would have provided powerful mitigating evidence in the punishment phase. *Id.* Burr testified that trial counsel should have investigated and discovered that Harris never belonged to a violent gang. ROA.23012:23-23013:3; ROA.23015:22-23016:6; ROA.23018:10:-23019:2; ROA.23020:3-23021:1.

The district court rejected Burr's testimony, claiming he was not a "trial lawyer" and had not reviewed every part of the record, even though he was only retained to provide testimony on the adequacy of the punishment phase of the trial. ROA.488; ROA.497. The district court failed to acknowledge that the state trial court explicitly rejected the State's attempt to disqualify Burr following the prosecutor's lengthy examination. ROA.22938-40; ROA.22995-23000. In Texas, an expert can provide opinions even based on hypothetical facts. *Held v. State*, 948 S.W.2d 45, 53 (Tex. App. 1997). Burr reviewed the parts of the record that he needed to review. ROA.488; ROA.497. On cross-examination,

the State did not identify any deficiency in the foundation supporting his testimony because he did not review every page of the record.

Neither the State nor the district court identified any standard of care or professional norm that contradicted Burr's testimony, but instead rejected the concept of objective standards entirely: The district court claimed that:

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

ROA.500. This dismissal of concrete, objective standards directly contradicts *Strickland's* requirement that habeas courts must identify whether the representation "fell below an *objective* standard of reasonableness," which is the "professional norms" prevailing in the time and place of the trial. 466 U.S. at 688.

The Supreme Court and this Court have identified the ABA Guidelines as memorializing professional norms that at the time of Harris's trial may have been relevant. *Cullen v. Pinholster*, 563 U.S. 170, 232 (2011) (Sotomayor, J., dissenting) ("[T]he prevailing professional

norms at the time of Pinholster's trial required his attorneys to 'conduct a thorough investigation of the defendant's background,' ... ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980) ... or 'to make a reasonable decision that makes particular investigations unnecessary.'"). "'Restatements of professional standards,' like the American Bar Association's (ABA) Guidelines for defense attorneys, 'can be useful as "guides" to what reasonableness entails,'" because they "'describe the professional norms prevailing when the representation took place.'" *Murphy*, 737 F. App'x at 703 (quoting *Van Hook*, 558 U.S. at 7); *Rompilla*, 545 U.S. at 387 ("[W]e long have referred [to these ABA Standards] as 'guides to determining what is reasonable.") (quoting *Wiggins,* 539 U.S., at 524) (cleaned up). Texas courts regard the Texas Guidelines the same way. *See Ex parte Van Alstyne*, 239 S.W.3d 815, 822 (Tex. Crim. App. 2007) (applying both the ABA and Texas Guidelines in finding "the important role of experts in screening defendants for mental health issues, including mental retardation"); *In re McCann*, 422 S.W.3d 701, 707 (Tex. Crim. App. 2013) (noting the similarity between the ABA and Texas Guidelines and that both guidelines are "persuasive authority" "designed to safeguard a criminal-defendant's interests"). The courts

also rely on expert testimony such as Burr's. *See Hamilton v. Ayers*, 583 F.3d 1100, 1130 (9th Cir. 2009) ("The district court clearly erred in relying on the testimony of Hamilton's trial counsel as to the 'standard capital practice' at the time of trial and rejecting the testimony of Hamilton's *Strickland* expert."); *Allen v. Woodford*, 395 F.3d 979, 1001 (9th Cir. 2005) (identifying professional norms required by *Strickland* by quoting "[a]n expert testifying for Allen [who] explained the lengthy process of preparing a mitigation case"); *Streber v. Hunter*, 221 F.3d 701, 722 (5th Cir. 2000) ("expert testimony is necessary to establish the standard of care since only an attorney can competently testify to whether the defendant comported to the prevailing legal standard").

After rejecting any objective standards against which to measure trial counsel's actions, the district court was left only with trial counsel's subjective post hoc assertions attempting to justify their admitted failure to investigate. As a result, the district court failed to conduct "an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington*, 562 U.S. at 110.

The Supreme Court corrected a similar problem in *Moore v. Texas*, 581 U.S. 1 (2017), addressing a mental health issue, and holding that a

Texas court improperly relied on its own "nonclinical" factors for determining mental disability, rather than the "medical community's diagnostic framework." *Id.* at 20-21. Thus, the courts must measure trial counsel's performance against professional norms developed by lawyers experienced in representing capital defendants—whether offered through the ABA Guidelines, expert testimony, or other recognized sources for which there is a proper foundation.

## IV. The district court misapplied *Jones* and *Strickland* when weighing aggravating against mitigating factors to determine prejudice.

Harris must show that trial counsel's deficient performance prejudiced him. *Andrus,* 590 U.S. at 821. "[P]rejudice exists if there is a reasonable probability that, but for his counsel's ineffectiveness, the jury would have made a different judgment about whether [Harris] deserved the death penalty as opposed to a lesser sentence." *Id.*

The district court purported to follow *Thornell v. Jones*, 602 U.S. 154 (2024). The district court applied the balancing test from *Jones*, weighing aggravating factors against mitigating factors. ROA.509 ("'[W]here the aggravating factors greatly outweigh the mitigating

evidence, there may be no 'reasonable probability' of a different result.'") (quoting *Jones*, 602 U.S. at 165).

But *Jones* held that in assessing mitigating evidence, a habeas court must apply the governing state law framework, in that case Arizona law: "Under Arizona law at the time, the court was required to 'impose a sentence of death' if it found 'one or more' statutorily enumerated 'aggravating circumstances' and 'no mitigating circumstances sufficiently substantial to call for leniency.'" *Jones*, 602 U.S. at 159 (quoting Ariz. Rev. Stat. Ann. § 13-703(E) (1993)); *see also id*. at 170-71 (citing *State v. Hampton*, 140 P.3d 950, 968 (Ariz. 2006)) (concluding that the multiple-homicides aggravator outweighed evidence of a "horrendous childhood").

Texas law is different. "Texas' capital sentencing scheme does not involve the direct balancing of aggravating and mitigating circumstances." *Ex parte Gonzales*, 204 S.W.3d 391, 394 (Tex. Crim. App. 2006). It asks the jury to answer a mitigation issue that considers the entire record and does not pit discrete aggravating factors against the mitigation evidence: "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's

character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." *Id.* at 393-94 & n.8 (quoting Tex. Code Crim. Proc. art. 37.071, § 2(e)(1)). Texas courts have therefore "adapted the Supreme Court's prejudice test to require a showing that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently." *Id.* at 394.

The difference in Texas law matters here. As explained in *Stringer v. Black*, 503 U.S. 222 (1992), in a weighing death penalty regime, "after a jury has found a defendant guilty of capital murder and found the existence of at least one statutory aggravating factor, it must weigh the aggravating factor or factors against the mitigating evidence." *Id.* at 229. By contrast, in a non-weighing state such as Texas, "the jury must find the existence of one aggravating factor before imposing the death penalty, *but aggravating factors as such have no specific function in the jury's decision whether a defendant who has been found to be eligible for the death penalty should receive it under all the circumstances of the case.*" *Id.* at 229-30 (emphasis added). In non-weighing regimes, "aggravating

circumstances serve only to make a defendant eligible for the death penalty and not to determine the punishment." *Clemons v. Mississippi*, 494 U.S. 738, 745 (1990). "[T]he factfinder takes into consideration all circumstances before it from both the guilt-innocence and the sentence phases of the trial. These circumstances relate both to the offense and the defendant." *Stringer*, 503 U.S. at 230.

The district court therefore erred in applying Arizona's balancing scheme in *Jones* instead of Texas's non-weighing scheme.[2] Texas's non-weighing scheme for a jury's determination of whether the death penalty should be imposed is more favorable to the defendant than a weighing scheme such as Arizona's. This is because, in a non-weighing scheme, the jury must consider all evidence presented during the guilt or sentencing phases of the trial, not just the statutorily enumerated

---

[2] Courts are sometimes confused by *Strickland*'s discussion of weighing aggravating factors against mitigating factors—as the district court here was confused. But in *Strickland*, the Supreme Court was in part reviewing the Florida Supreme Court's application of Florida's weighing scheme as required by Florida law. *See* 466 U.S. at 675 ("A careful consideration of all matters presented to the court impels the conclusion that there are insufficient mitigating circumstances ... to outweigh the aggravating circumstances.") (quoting *Washington v. State*, 362 So.2d 658, 663-64 (Fla. 1978)). Under Florida law, the jury must weigh aggravating factors against mitigating circumstances to determine whether the death penalty should be imposed. Fla. Stat. § 921.141.

aggravating factors. *Stringer*, 503 U.S. at 230. This broader consideration requires the jury to consider more mitigating evidence supporting a lesser sentence.

*Gonzales* demonstrates how the Texas scheme works. The court does not consider whether aggravating factors override mitigating evidence, but instead whether "the applicant's available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of the applicant's moral culpability." *Gonzales*, 204 S.W.3d at 399-400. This standard precludes a death penalty where "there is at least a reasonable probability that, had this mitigating evidence been available at the applicant's original punishment hearing, a different result would have occurred, such that it undermines our confidence in the outcome." *Id*.

In contrast, *Jones* applied a different Arizona scheme:

> Most of the mitigating evidence Jones presented at the federal evidentiary hearing was not new, and what was new would not carry much weight in Arizona courts. Conversely, the aggravating factors present here are extremely weighty. As a result, there is no reasonable probability that the evidence on which Jones relies would have altered the outcome at sentencing.

602 U.S. at 165.  In contrast here, all mitigating evidence offered by Harris was new, and no court could conceivably conclude that it would not carry much weight under Texas law.

The district court evaluated prejudice by focusing solely on the evidence offered by the prosecution at trial, disregarding abundant mitigating evidence presented by habeas counsel.  For example, the district court completely discounted the MRI showing brain damage, Dr. Davies's diagnosis that Harris suffered from FASD, Dr. Dydek's testimony that Harris suffered cognitive impairments as a result of lead poisoning, and that the State falsely claimed Harris was in a violent gang.  The district court also ignored Harris's tormented psycho-social history.

This violated Texas law and therefore *Jones*.  The Supreme Court in *Andrus* provides the model for the correct application of Texas law:

> The record before us raises a significant question whether the apparent "tidal wave" of "available mitigating evidence taken as a whole" might have sufficiently "'influenced the jury's appraisal' of [Andrus'] moral culpability" as to establish *Strickland* prejudice.  That prejudice inquiry "necessarily require[s] a court to 'speculate' as to the effect of the new evidence" on the trial evidence, "regardless of how much or little mitigation evidence was presented during the initial penalty phase."

*Andrus*, 590 U.S. at 823-24 (citations omitted).

The district court's erroneous application of a weighing scheme led to the same binary analysis as the Supreme Court reversed in *Porter v. McCollum*, 558 U.S. 30, 42-43 (2009)—a case where the Court rejected the Florida court's outright dismissal of mitigating factors even under Florida's weighing scheme. The Court concluded that "[t]he Florida Supreme Court either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing" because of Florida's weighing scheme. *Id.* at 42. In reversing, the Supreme Court noted that "[u]nder Florida law, mental health evidence that does not rise to the level of establishing a statutory mitigating circumstance may nonetheless be considered by the sentencing judge and jury as mitigating…. Indeed, the Constitution requires that 'the sentencer in capital cases must be permitted to consider any relevant mitigating factor.'" *Id.* The Supreme Court reversed because:

> neither the postconviction trial court nor the Florida Supreme Court gave any consideration for the purpose of nonstatutory mitigation to Dr. Dee's [the defense expert's] testimony regarding the existence of a brain abnormality and cognitive defects. While the State's experts identified perceived problems with the tests that Dr. Dee used and the conclusions that he drew from them, it was not reasonable to discount

> entirely the effect that his testimony might have had on the jury or the sentencing judge.

*Id.* at 42-43. Thus, the Court held, even though Florida was a weighing state, Florida courts could not ignore mitigating evidence.

Here, Texas is a non-weighing state, in contrast to Florida, which made it even worse than in *Porter* that the district court entirely dismissed Harris's evidence, summarily asserting that "the new mitigating evidence Harris presented of both FASD/ARND and lead poisoning was weak." ROA.507. In doing so, the district court erroneously applied a preponderance of the evidence standard and adjudicated the ultimate issue it should have left for a future jury to decide: "An applicant asserting a claim of ineffective assistance of counsel has the burden to prove, by a preponderance of the evidence, that ... the deficient performance prejudiced the defense such that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" ROA.301-302. But "*Strickland* held that to prove prejudice the defendant must establish a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different;' it specifically rejected the proposition that the defendant had to prove it more likely than not

that the outcome would have been altered." *Woodford v. Visciotti*, 537 U.S. 19, 22 (2002). "Reasonable probability" to prove prejudice is less of a burden than a preponderance of the evidence. *Strickland*, 466 U.S. at 694 (holding that prejudice can be shown "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome"); *accord Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) ("[A] reasonable probability that ... the result of the proceeding would have been different ... does not require demonstration by a preponderance.").

## V. The district court misapplied Supreme Court precedent in finding that trial counsel was not deficient when he solicited testimony that Harris wore a stun belt during trial.

The district court incorrectly rejected Harris's claim that trial counsel was ineffective in eliciting and failing to object to testimony that Harris wore a stun belt at trial. Courts have long recognized a defendant's right to avoid appearing before a jury in visible restraints. *Deck v. Missouri*, 544 U.S. 622, 630-32 (2005).

Here again, there is no evidence that trial counsel made any strategic decision or undertook any investigation that would make any purported strategic decision reasonable. *See Neal*, 78 F.4th at 790 ("A reviewing court must determine not only whether counsel made a

strategic decision, but also whether that decision was reasonable based on the investigation that preceded it.").

The Supreme Court has held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination ... that they are justified by a state interest specific to a particular trial." *Id.* at 629. When the jury is made aware of the defendant's physical restraints, it destroys the presumption of innocence which every defendant is guaranteed. *Id.* at 630. This extends to the punishment phase of trial, as "[v]isible shackling undermines the presumption of innocence and the related fairness of the factfinding process." *Id.* Visible shackles or restraints "suggest[] to the jury that the justice system itself sees a 'need to separate a defendant from the community at large.'" *Id.*

A defendant's appearance in restraints before a jury "almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community—often a statutory aggravator and nearly always a relevant factor in jury decision making." *Id.* at 633; *see also Marquez v. Collins*, 11 F.3d 1241, 1243 (5th

Cir. 1994) ("Shackling carries the message that the state and the judge think the defendant is dangerous, even in the courtroom.").

The law is well established that shackling is "inherently prejudicial" and that where jurors become aware of a defendant's restraints, the State then bears the burden of proving "beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained." *Deck*, 544 U.S. at 635; *see also Boone v. State*, 230 S.W.3d 907, 912 (Tex. App. 2007) (when jurors know a defendant is physically restrained during trial, "the burden falls on the State to prove that the error was harmless beyond a reasonable doubt"); *Wiseman v. State*, 223 S.W.3d 45, 50-52 (Tex. App. 2006) (reversing conviction where court repeatedly restrained criminal defendant); *Mendoza v. State*, 1 S.W.3d 829, 831 (Tex. App. 1999) (reversing conviction where defendant appeared in front of the jury in shackles); *Shaw v. State*, 846 S.W.2d 482, 487 (Tex. App. 1993) (reversing conviction where defendant was bound and gagged within plain view of the jury); *Penn v. State*, 628 S.W.2d 179, 180-81 (Tex. App. 1982) (reversing conviction where defendant was shackled and the State did not prove restraints were necessary to prevent escape).

The use of stun belts "raises all of the traditional concerns about the imposition of physical restraints." *Gonzalez v. Pliler*, 341 F.3d 897, 900 (9th Cir. 2003). "[I]n view of the nature of a stun belt and the debilitating and humiliating consequences that such a belt can inflict … it is reasonable to believe that many if not most persons would experience an increase in anxiety if compelled to wear such a belt" at trial. *Id.* at 901. "This increase in anxiety may impact a defendant's demeanor … [and], in turn, impact[] a jury's perception of the defendant, thus risking … prejudicial [e]ffect." *Id.* Jurors may also recognize the use of a stun belt as evidence that a defendant is "violent and unpredictable ... encouraging it to sentence such a person, already found to be a murderer, to death." *Stephenson v. Neal*, 865 F.3d 956, 959 (7th Cir. 2017). For these reasons, "a decision to use a stun belt must be subjected to at least the same close judicial scrutiny required for the imposition of other physical restraints." *United States v. Durham*, 287 F.3d 1297, 1306 (11th Cir. 2002).

The district court attempted to avoid this well-settled constitutional prohibition by claiming that "the decision by attorney Lollar not to interrupt the flow of his punishment phase cross-examination of deputy

Moorehead by objecting to the spontaneous utterance about the stun belt was objectively reasonable." ROA.325. Again, the district court relied on counsel's post hoc rationalizations. Worse, the district court resorted to the illogic that the jury would not necessarily conclude that, because he wore a stun belt on his way to court for voir dire, "Harris wore a stun belt during trial or inside the courtroom." ROA.525. The district court also misidentified the issue by claiming that it was whether Loller should have objected to Moorehead's comment: "objecting to Moorehead's comment could well have created confusion in the minds of the jury and distracted from the point Lollar was attempting to make during his cross-examination." *Id.* In truth, Loller's mistake was in asking the questions about the stun belt in the first place, as in doing so he elicited testimony that would never have been in the record, and opened the door for the prosecutor on redirect to question Moorehead even more about the stun belt.

Lollar testified at the evidentiary hearing that he made a "strategy decision" to allow the jury to hear "powerful evidence to show ... that he would not be a future danger once he's off PCP ... that he could be trusted in that type of a situation." ROA.22351:7-12; ROA.22352:19-21. But

there is no evidence in the record that Loller considered at the time that his question would inevitably elicit testimony from a hostile government witness that Harris was wearing a stun belt. Regardless, Loller's decision to bring up the elevator incident was objectively unreasonable. Decades of case law establishing the due process right not to be shackled in front of a jury evinces universal recognition that shackling a defendant destroys the presumption of innocence and is damningly prejudicial. Given the courts' longstanding recognition of restraints at trial as prejudicial, no reasonable attorney would volunteer to the jury that his client was wearing a stun belt. "A decision that counsel defends as trial strategy might nonetheless be objectively unreasonable; the magic word 'strategy' does not insulate a decision from judicial scrutiny." *Carter v. State*, 506 S.W.3d 529, 534 (Tex. App. 2016). Here, trial counsel's "strategy" was constitutionally and strategically infirm. Lollar violated Harris's constitutional rights when he precipitated testimony that Harris was wearing a stun belt that was built to "incapacitate" him with "75 to 85,0000 volts zero amperage." ROA.20226:7-19.

Rather than showing the jury that Harris "could be trusted," Deputy Moorehead's testimony told the jury that Harris was so

dangerous that he could not be trusted to walk into the courtroom unless he was under constant threat of being shocked. "[S]eeing a defendant in the courtroom in shackles 'could instill in the jury a belief that the defendant is a dangerous individual who cannot be controlled, an idea that could be devastating to his defense.'" *State v. Choice*, 319 S.W.3d. 22, 26 (Tex. App. 2008).

Trial counsel's decision to have Deputy Moorehead testify that the State forced Harris to wear a stun belt fell below prevailing professional norms. A lawyer's mere failure to object to a stun belt is deficient performance and grounds for reversal of a death sentence. *Stephenson*, 865 F.3d at 957-59. But trial counsel did not merely allow evidence of the stun belt to be presented to the jury—he *elicited* it. His failure to recognize that his question would incite the hostile witness to volunteer that Harris was wearing a stun belt and open the door to further redirect disclosing the fact that Harris was wearing a stun belt is inexcusable given courts' universal recognition of the prejudicial quality of such testimony.

In sentencing Harris to death, the jury found that Harris "would commit criminal acts of violence that would constitute a continuing

threat to society." ROA.473. There is a reasonable probability that, but for trial counsel's error in introducing obviously prejudicial information into the trial, the jury would not have found that Harris would be a "continuing threat to society." Harris's sentence must therefore be vacated, and he is entitled to a new trial.

## CONCLUSION

The Court should grant the Certificate of Appealability and reverse or, alternatively, set a briefing schedule for briefs on the merits of the appeal.

Respectfully submitted,

*/s/ Gwendolyn C. Payton*

Adam H. Charnes
KILPATRICK TOWNSEND &
  STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
(214) 922-7106

Gwendolyn C. Payton
John R. Neeleman
KILPATRICK TOWNSEND &
  STOCKTON LLP
1420 Fifth Ave., Suite 3700
Seattle, Washington 98101
(206) 626-7714

*Attorneys for Petitioner-Appellant*
*Roderick Napoleon Harris*

## CERTIFICATE OF COMPLIANCE

1.    This motion and brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(1) because it contains 12,976 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2.    This motion and brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Century Schoolbook 14-point font using Microsoft Word 2016.

DATED: March 20, 2025.

/s/ *Gwendolyn C. Payton*
Gwendolyn C. Payton
KILPATRICK TOWNSEND &
  STOCKTON LLP
1420 Fifth Ave., Suite 3700
Seattle, Washington
(206) 626-7714

# CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2025, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, which will provide notification of such filing to all counsel of record.

/s/ *Gwendolyn C. Payton*
Gwendolyn C. Payton
KILPATRICK TOWNSEND &
  STOCKTON LLP
1420 Fifth Ave., Suite 3700
Seattle, Washington
(206) 626-7714