No. 24-70009

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

Roderick Napoleon Harris,
*Petitioner-Appellant,*

v.

ERIC GUERRERO, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,
*Respondent-Appellee.*

_____

Appeal from the United States District Court for
the Southern District of Texas, Houston Division,
Case No. 3:20-cv-03702-E, Hon. Ada Brown

_____

**REPLY IN SUPPORT OF MOTION FOR
CERTIFICATE OF APPEALABILITY**

_____

Gwendolyn C. Payton
John R. Neeleman
KILPATRICK TOWNSEND &
  STOCKTON LLP
1420 Fifth Ave., Suite 3700
Seattle, Washington 98101
(206) 626-7714

Adam H. Charnes
KILPATRICK TOWNSEND &
  STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
(214) 922-7106

*Attorneys for Petitioner-Appellant*
*Roderick Napoleon Harris*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES .................................................... iii

INTRODUCTION ....................................................................... 1

ARGUMENT ............................................................................. 4

I.     The Court cannot defer to trial counsel's "judgment" where there was no investigation at all. ...................................... 4

II.    The State relies only on trial counsel's subjective, post hoc rationalizations which are not credible. ............................. 8

III.    The State is wrong that the district court does not have to identify professional norms to assess trial counsel's performance. .................................................................. 14

     A.    *Strickland* requires habeas courts to identify and apply professional norms. ................................................. 15

     B.    Absent evidence from the State as to professional norms, the district court should have applied the evidence offered by Harris. ...................................... 17

IV.    The State misapplies the Supreme Court's prejudice standard because it misstates Texas capital sentencing law ........ 19

     A.    The State misrepresents Harris's argument. ....................... 22

     B.    Had it been presented at trial, Harris's mitigation evidence would likely have spared him the death penalty. ................................................................. 25

          1.    Harris's objective brain damage is uncontested and confirmed by an MRI. ........................................ 25

2.    Harris suffers from Fetal Alcohol Spectrum Disorder. ................................................................ 26

3.    Harris suffered brain damage from toxic lead exposure ............................................................... 27

4.    Harris experienced severe abuse and neglect. ........... 27

5.    Harriss's mitigation evidence could have led one juror to choose life. ............................................. 28

6.    Under Texas's non-weighing framework, the district court cannot summarily dismiss Harris's new mitigation evidence as "weak." ............................ 29

V.    Trial counsel's decision to introduce evidence that Harris was wearing a stun belt was deficient and presumptively prejudicial. ...................................................................... 32

A.    Trial counsel's introduction of stun belt evidence was ineffective assistance of counsel. ............................. 32

B.    The stun belt testimony was inherently prejudicial. ........... 33

CONCLUSION ........................................................................ 34

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Bobby v. Van Hook,*
 558 U.S. 4 (2009) ............................................................ 16, 17

*Border Demolition & Env't, Inc. v. Pineda,*
 535 S.W.3d 140 (Tex. Ct. App. 2017) ................................. 18

*Canales v. Davis,*
 966 F.3d 409 (5th Cir. 2020) ........................................ 24, 30

*Clemons v. Mississippi,*
 494 U.S. 738 (1990) .............................................................. 24

*Cotton v. Cockrell,*
 343 F.3d 746 (5th Cir. 2003) ................................................. 4

*Deck v. Missouri,*
 544 U.S. 622 (2005) ................................................... 3, 33, 34

*Earp v. Cullen,*
 623 F.3d 1065 (9th Cir. 2010) ............................................. 18

*Eddings v. Oklahoma,*
 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) ........................ 10, 11

*Escamilla v. Stephens,*
 749 F.3d 380 (5th Cir. 2014) ............................................... 11

*Ex parte Gonzales,*
 204 S.W.3d 391 (Tex. Crim. App. 2006) ...................... 21, 22, 23, 25, 29

*Harrington v. Richter,*
 562 U.S. 86 (2011) .............................................................. 16

*Holbrook v. Flynn,*
 475 U.S. 560 (1986) ............................................................. 33

*Jacobellis v. Ohio*,
  378 U.S. 184 (1964) .............................................................. 2

*Johnson v. Trigg*,
  28 F.3d 639 (7th Cir. 1994) .............................................. 17

*Kyles v. Whitley*,
  514 U.S. 419 (1995) ............................................................ 31

*Lockett v. Ohio*,
  438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ............................ 10

*Morton v. Sec'y, Fla. Dep't of Corr.*,
  684 F.3d 1157 (11th Cir. 2012) .......................................... 11

*Mosley v. State*,
  983 S.W.2d 249 (Tex. Crim. App. 1998) .................. 19, 20, 23

*Murphy v. Davis*,
  737 F. App'x 693 (5th Cir. 2018) ........................... 12, 13, 17

*Murphy v. Davis*,
  901 F.3d 578 (5th Cir. 2018) ................................................ 5

*Neal v. Vannoy*,
  78 F.4th 775 (5th Cir. 2023) ................................................ 8

*Nelson v. Davis*,
  952 F.3d 651 (5th Cir. 2020) .............................................. 32

*Porter v. McCollum*,
  558 U.S. 30 (2009) .................................................. 28, 30, 31

*Richards v. Quarterman*,
  566 F.3d 553 (5th Cir. 2009) .............................................. 33

*Riggins v. Nevada*,
  504 U.S. 127 (1992) ............................................................ 33

*Rompilla v. Beard,*
545 U.S. 374 (2005) .................................................................. 18, 28

*State v. Choice,*
319 S.W.3d. 22 (Tex. Ct. App. 2008) ................................................ 34

*Stephenson v. Neal,*
865 F.3d 956 (7th Cir. 2017) ............................................................. 34

*Strickland v. Washington,*
466 U.S. 668 (1984) ................................................................ *passim*

*Stringer v. Black,*
503 U.S. 222 (1992) ........................................................... 21, 23, 24

*Thornell v. Jones,*
602 U.S. 154 (2024) ........................................................... 19, 20, 25

*United States v. Durham,*
287 F.3d 1297 (11th Cir. 2002) ........................................................ 34

*Wainwright v. Witt,*
469 U.S. 412 (1985) ........................................................................ 17

*Wiggins v. Smith,*
539 U.S. 510 (2003) ..................................................... 8, 12, 13, 18, 28

*Williams v. Filson,*
908 F.3d 546 (9th Cir. 2018) ............................................................... 7

*Williams v. Lynaugh,*
809 F.2d 1063 (5th Cir. 1987) ............................................................. 9

*Woodford v. Visciotti,*
537 U.S. 19 (2002) .......................................................................... 30

## Statutes

Tex. Code Crim. Proc. art. 37.071, § 2(e)(1) ....................................... 22, 28

**Rules**

Fed. R. Evid. 704 ....................................................................... 18

**Other Authorities**

ABA Guidelines for the Appointment & Performance of Defense
    Counsel in Death Penalty Cases,
    Guideline 10.11 cmt. ............................................................ 13

## INTRODUCTION

The State's response misstates the governing law and cannot avoid the core constitutional violations in this case.  Harris's trial counsel failed to conduct even a minimal investigation into his background, despite glaring red flags of brain damage, fetal alcohol spectrum disorder (FASD), lead exposure, and a history of profound childhood trauma.  What the State characterizes as an "investigation" was nothing more than a mid-trial email from an expert who was neither qualified nor instructed to evaluate the most compelling mitigation evidence directly in front of trial counsel.  The result was a sentencing proceeding where the jury heard none of Harris's powerful mitigating evidence.  Under *Strickland v. Washington*, 466 U.S. 668 (1984), that failure was both deficient and prejudicial.

The State concedes that the district court failed to identify and apply any objective professional norms for measuring trial counsel's performance.  The State argues that habeas courts are not required to identify any professional norms.  But the State is wrong.  Habeas courts must articulate applicable professional norms before determining whether counsel's performance constituted ineffective assistance.  This

requirement is simple common-sense:  How can the habeas court determine whether counsel's performance was adequate without using a standard for adequacy?  "I know it when I see it" is not the *Strickland* standard. *Cf. Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

This case illustrates the danger of what happens when a habeas court fails to identify and measure against any objective professional norms.  Here, the district court improperly relied on trial counsel's subjective, post hoc rationalizations for their failure to provide competent representation.  The district court improperly credited trial counsel's post hoc rationalizations for their failure to investigate powerful mitigating evidence that Harris suffered from effects of FASD and lead poisoning.  The district court also accepted trial counsel's post hoc excuses for failing to prepare a psycho-social history for Harris.

With respect to prejudice, the State mischaracterizes Harris's position on Texas's capital sentencing scheme, suggesting he advocates for a one-sided mitigation-only analysis.  He does not.  Harris correctly explains that Texas employs a non-weighing scheme in which jurors must determine whether all the mitigation evidence justifies a life

sentence as opposed to balancing aggravating against mitigating factors. Under the Texas framework, the question is whether there is a reasonable probability that at least one juror would have answered the mitigation issue differently had they been presented with the full picture of Harris's impairments and life history.

The powerful new mitigation evidence makes that probability not just reasonable—but inevitable. The State urges the Court to reject Harris's claims in conclusory fashion as "weak," but there is more than a reasonable probability that, applying Texas's non-weighing framework, at least one juror would have decided against death.

The State also tries to downplay the prejudice caused when trial counsel introduced testimony that Harris was wearing a stun belt in front of the jury. But this was not a reasonable strategic decision. Disclosure that Harris was wearing a stun belt was presumptively prejudicial and violated due process under *Deck v. Missouri*, 544 U.S. 622 (2005).

3

# ARGUMENT

## I. The Court cannot defer to trial counsel's "judgment" where there was no investigation at all.

The State leans heavily on the axiom that courts must review
Harris's claim "applying a heavy measure of deference to counsel's
judgments."  Resp. at 17 (quoting *Strickland*, 466 U.S. at 691).  Yet as
the state itself admits, courts will only defer to trial counsel's judgment
if that counsel "made an adequate investigation," and can only defer to
"strategic decisions made as a result of that investigation."  *Id.* at 17-18
(quoting *Cotton v. Cockrell*, 343 F.3d 746, 752 (5th Cir. 2003)) ("So long
as counsel made an adequate investigation, any strategic decisions
made as a result of that investigation fall within the wide range of
objectively reasonable professional assistance.").

Here, the record shows that no investigation occurred.  The State's
sole argument to attempt to claim that trial counsel performed an
investigation is that one non-testifying expert, Dr. Antoinette
McGarrahan, told them mid-trial that she had no valuable testimony
for trial.  *Id.* at 19–21.  This cannot be sufficient inquiry into whether
Harris suffered from FASD or lead poisoning.  Mid-trial is too late to
conduct any investigation into FASD or lead poisoning.

4

McGarrahan first conveyed her views to trial counsel in an email stating that she had nothing helpful to say about Mr. Harris a week after trial had begun.  ROA.21852–53.  She never evaluated Harris for FASD or lead toxicity, and she testified that she had never previously diagnosed either condition in anyone.  ROA.22698:12–22699:13; ROA.22706:15–19; ROA.22812:13–22813:13.  McGarrahan did not recall discussing FASD or lead exposure with counsel at any time.  ROA.22699–700; ROA.22706.  Even so, she later testified in state habeas proceedings that Harris's test results were consistent with FASD.  ROA.22700.

Trial counsel's failure to investigate violates *Strickland*:  "Of course, hiring an expert and having her testify does not give counsel license to 'completely abdicate ... responsibility.'"  *Murphy v. Davis*, 901 F.3d 578, 592 (5th Cir. 2018) (citation omitted).  Counsel may "rely on that expert to alert counsel to additional needed information or other possible routes of investigation." *See id.* (citation omitted).  But that is not what happened here.  No investigation happened at all.

Trial counsel's testimony confirms this failure.  Counsel were aware of key mitigation red flags: both attorneys knew before trial that

5

Harris's mother drank during her pregnancy (ROA.22377:16–22378:5; ROA.22811:19–22), and they knew Harris had grown up adjacent to the toxic RSR lead smelter in Dallas.  ROA.22381–82.  Lead counsel Lollar admitted he knew by 2012 that FASD was a recognized and powerful mitigating condition.  ROA.22379:20–22380:5.  Yet trial counsel made no effort to investigate either FASD or lead exposure.  ROA.22379:2–14; ROA.22876–77.

None of the defense team knew whether McGarrahan was qualified to diagnose FASD, and they all admitted they knew she had never done so.  ROA.22702:23–24; ROA.22812:13–22813:13.  Nonetheless, Lollar relied on her to determine whether further investigation was warranted—and she never made that determination.  She wasn't asked to.

This is not, as the State asserts, a question of tactical discretion or marginal judgment.  *See* Resp. at 18.  This was complete failure to investigate.  Counsel overlooked or ignored available evidence, failed to seek out or engage qualified experts, and relied on a psychologist they did not vet and did not direct—all despite knowing that FASD and lead exposure could yield compelling mitigation.

The State argues that the Court should excuse this admitted failure to investigate because trial counsel had FASD and lead poisoning on their "radar," citing an alleged conversation McGarrahan had with Harris's mother in which she purportedly disclosed "for the first three months of pregnancy there may have been some alcohol but not much." Resp. at 19 (citing ROA.22707). But since FASD was "on their radar," trial counsel should have themselves interviewed their client's mother, and questioned her about alcohol consumption while she was pregnant with her son who they were defending in a capital murder case. Had counsel asked basic follow-up questions—such as what kind of alcohol and how often—they would have learned that Harris's mother drank fortified wines like Wild Irish Rose and Thunderbird "every weekend" during her first trimester. ROA.21978:8–11; ROA.22121:12–17. These are wines with alcohol by volume ranging from 13% to 18%—substantially stronger than standard table wine. *Id.* "[T]he presence of certain elements in a capital defendant's background, such as a family history of alcoholism, abuse, and emotional problems, triggers a duty to conduct further inquiry before choosing to cease investigating." *Williams v. Filson*, 908 F.3d 546, 566 (9th Cir. 2018)

(citation omitted). "[W]e focus on whether the investigation supporting counsel's decision ... *was itself reasonable*." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (emphasis in original).

Trial counsel admitted they would have introduced evidence that Harris suffered from FASD had they known of it. ROA.22390:10–15. This Court should not defer to what were plainly non-decisions by counsel. As this Court recently reaffirmed, deference to counsel's judgment under *Strickland* does not apply where no reasonable investigation supported that judgment. *Neal v. Vannoy*, 78 F.4th 775, 790 (5th Cir. 2023).

This was not a matter of degree. It was a wholesale failure to investigate obvious mitigation.

## II. The State relies only on trial counsel's subjective, post hoc rationalizations which are not credible.

The State acknowledges that "Harris is correct that post hoc rationalizations should not be used to justify a trial counsel's conduct." Resp. at 30 (citing *Wiggins*, 539 U.S. at 526–27). Yet the State does nothing but offer post hoc rationalizations. Trial counsel's purported reliance on McGarrahan's mid-trial email to justify no investigation of FASD or lead poisoning is a post hoc rationalization.

The State argues that "trial counsel had to consider the risk of putting someone who personally examined Harris on the stand, as it would open the door for the State to present its own expert who may have testified about psychopathic traits" including "future dangerousness." *Id.* at 26-27. Relatedly, the State argues that "trial counsel knew that evidence of an incurable cognitive impairment would undermine their future dangerousness theory." *Id.* at 27.

But the record shows conclusively that they did not consider any trade off that would be involved in putting on evidence of FASD or lead poisoning. First, any waiver of Harris's Fifth Amendment right that would otherwise prevent the State's expert from examining him is not absolute and is limited to the scope of the issues raised by the defense's expert testimony—here, evidence of FASD and lead poisoning. *Williams v. Lynaugh*, 809 F.2d 1063, 1068 (5th Cir. 1987) ("when a defendant introduces psychiatric evidence on a critical issue, he waives his fifth and sixth amendment objections to the state's psychiatric testimony, provided that the state's evidence is used solely in rebuttal and properly limited to the issue raised by the defense"). Trial counsel did not do any investigation that would allow them to consider such

options.  They never asked McGarrahan to investigate FASD or lead

poisoning, she did not provide her input until mid-trial, and she never

mentioned FASD or lead poisoning.  As the Eleventh Circuit has noted,

it is not true "as a matter of law" that counsel should at all costs avoid

introduction of antisocial personality disorder evidence.  Here, trial

counsel should have investigated FASD and lead poisoning evidence so

they could consider the trade-offs, and it may be that antisocial

personality disorder evidence could be turned to the defendant's

advantage—as indeed the Supreme Court once held that it was

ineffective assistance of counsel to *not* offer such evidence:

> [W]e have never ruled that a capital defense lawyer renders
> ineffective assistance as a matter of law when he introduces
> evidence of antisocial personality disorder for mitigation
> purposes.  And for good reason.  In *Eddings v. Oklahoma*,
> the Supreme Court of the United States explained that "the
> Eighth and Fourteenth Amendments require that the
> sentencer ... not be precluded from considering, as a
> mitigating factor, any aspect of a defendant's character or
> record and any of the circumstances of the offense that the
> defendant proffers as a basis for a sentence less than death."
> 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982)
> (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954,
> 2964, 57 L.Ed.2d 973 (1978)) (alteration and emphasis in
> original) (internal quotation marks omitted).  And the
> Supreme Court ruled that a sentencing court violated the
> constitutional rights of the defendant by failing to consider
> expert testimony that the defendant had an "antisocial

personality." *Id.* at 107–08, 102 S.Ct. at 873–74.
*Morton v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1157, 1168 (11th Cir. 2012).

Trial counsel could not make an informed strategic decision about *whether* to open this door because they did not investigate in the first place. *Escamilla v. Stephens*, 749 F.3d 380, 392 (5th Cir. 2014) ("We reject[ ] any suggestion that a decision to focus on one potentially reasonable trial strategy. . . . [i]s 'justified by a tactical decision' when 'counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background[.]'") (alterations in the original) (citation omitted).

The State does not deny that trial counsel failed to prepare a psycho-social history for Harris. The State argues that this issue is waived because Harris failed to argue it in the district court, but then in footnote 21 acknowledges that it is not waived because Harris clearly raised it in the state habeas proceeding. Regardless, there is a record that Harris offered the psychosocial history in the state court proceeding and the district court considered it. The psychosocial history conducted by Harris's habeas expert Dr. Laura Sovine is in the record

and summarized in detail by the district court.  *See* ROA.485-86.
Absence of a psycho-social history is part and parcel of trial counsel's
failure to investigate FASD and lead poisoning.

*Wiggins* recognized preparation of a psycho-social history is a
professional norm.  539 U.S. at 517, 524.  As this Court has noted,
immediately after *Wiggins,* all courts explicitly recognized that
preparation of a psycho-social history was a professional norm.
*Murphy v. Davis*, 737 F. App'x 693, 705 (5th Cir. 2018); *see also*
*Wiggins*, 539 U.S. at 517 ("[A]t the close of the [habeas] proceedings, the
judge observed from the bench that he could not remember a capital
case in which counsel had not compiled a social history of the
defendant, explaining, '[n]ot to do a social history, at least to see what
you have got, to me is absolute error.'").

But the State justifies this failure by claiming that trial counsel
"utilized multiple experts and presented Harris's background through
lay witnesses, who testified about Harris's upbringing, ADHD, learning
disorder, familial abuse and substance use, and lack of a relationship
with his biological father."  Resp. at 50.  "A mitigation specialist was
also appointed to Harris's case," but her work was so cursory and she

was so little invested in the case that, as the State acknowledges, "the mitigation investigator did not have an independent recollection of Harris's case." *Id.* She did not testify.

The State never explains why trial counsel's pursuit of these issues excuses their failure to investigate, develop, and present at trial Harris' comprehensive psycho-social history or why a plan to offer anecdotes from Harris's past made a psycho-social history unnecessary even though *Wiggins* has specifically identified it as required by the standard of care. As this Court has noted, immediately after *Wiggins*, all courts explicitly recognized that preparation of a psycho-social history was a professional norm. *Murphy*, 737 F. App'x at 705 ("Specifically, the Court held that counsel's failure in that case to retain a forensic social worker to prepare a social-history report on their client when funding was available rendered counsel's assistance constitutionally ineffective.") (citing *Wiggins*, 539 U.S. at 524).

Whether or not the trial team uses an expert to present the psycho-social history, they must develop one and present it through lay or fact witnesses. *See* ABA Guidelines for the Appointment & Performance of Defense Counsel in Death Penalty Cases, Guideline

10.11 cmt. (noting the importance of presenting "the client's complete social history" at punishment).  Trial counsel did call two experts to testify about-psychosocial issues in the abstract.  The State does not deny that neither expert called by the defense had any knowledge of the record or had ever interviewed any witnesses or even met Harris.  Both specifically denied being asked to render an opinion about Harris himself and only provided general information.  ROA.20104; ROA.20137.  Trial counsel did not prepare any of the expert witnesses to testify until after trial had already started, and then only for a *de minimis* amount of time.  ROA.22906:23-22907:6.  Counsel did not even meet with these "experts" until well into trial, and then only briefly.  *Id.* There is no plausible argument that this was a real mitigation defense.

## III.  The State is wrong that the district court does not have to identify professional norms to assess trial counsel's performance.

In response to Harris's claim that the district court failed to identify or apply professional norms, the State completely misses the point.  The district court was required to apply professional norms from some source, and the State does not deny that the district court completely failed to do so.  The State only argues that the district court

14

was not required to consider the ABA Guidelines or Richard Burr's testimony in particular. But the State does not offer any contrary norms.

### A. *Strickland* requires habeas courts to identify and apply professional norms.

*Strickland* explicitly held that habeas courts must identify whether the representation "fell below an *objective* standard of reasonableness," which is the "professional norms" prevailing in the time and place of the trial. *Strickland*, 466 U.S. at 688 (emphasis added). The State tries to ignore this by taking out of context one quotation from *Strickland* that it contends absolves habeas courts of any obligation to find and apply professional norms:

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

ROA.500. But this is only part of *Strickland's* broader holding: the court must apply some objective norm, although the Court in *Strickland* declined to mandate precisely what that norm would be for all times. Here, the State identifies no norms at all, nor could trial counsel's

conduct ever be consistent with any possible norm of professional conduct.

While the ABA Guidelines are only guidelines and not mandatory and do not necessarily "define what is reasonable conduct," it is nevertheless "the responsibility of the courts to determine the nature of the work that a defense attorney must do in a capital case in order to meet the obligations imposed by the Constitution…." *Bobby v. Van Hook*, 558 U.S. 4, 14 (2009) (Alito, J., concurring). The courts must identify objective evidence of prevailing norms to ensure that courts undertake "an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington v. Richter*, 562 U.S. 86, 105, 110 (2011). The habeas court's task is to identify "'[p]revailing norms of practice,'. . . and 'standard practice.'" *Van Hook*, 558 U.S. at 8 n.1 (internal citations omitted).

There is nothing in the district court's factual findings that assessed whether trial counsel's performance was deficient measured against "prevailing professional norms" in trial counsel's locale at the time of trial, as required by *Strickland*, 466 U.S. at 688. The state habeas court's findings must be "evidenced by a written finding, written

opinion, or other reliable and adequate written indicia." *Wainwright v. Witt*, 469 U.S. 412, 426 n.7, 430 (1985) (citation omitted); *see also Johnson v. Trigg*, 28 F.3d 639, 644 (7th Cir. 1994) ("[O]ne of the statutory conditions, a condition implicit as it happens in any review of findings other than those made by juries and arbitrators, is that there must be 'reliable and adequate written indicia' of the state court's finding . . . .") (quoting *Wainwright*, 469 U.S. at 430).

**B.     Absent evidence from the State as to professional norms, the district court should have applied the evidence offered by Harris.**

The State has not offered evidence of professional norms, and thus the district court should have accepted the evidence offered by Harris: the relevant ABA Guidelines and expert opinions of Richard Burr.  The Supreme Court and this Court have identified the ABA Guidelines as one source of professional norms at the time of Harris's trial that may have been relevant.  "'Restatements of professional standards,' like the American Bar Association's (ABA) Guidelines for defense attorneys, 'can be useful as "guides" to what reasonableness entails,'" because they "'describe the professional norms prevailing when the representation took place.'" *Murphy*, 737 F. App'x at 703 (quoting *Van Hook*, 558 U.S.

at 7); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) ("[W]e long have referred [to these ABA Standards] as 'guides to determining what is reasonable.'") (quoting *Wiggins,* 539 U.S., at 524) (cleaned up).

Expert testimony from a qualified expert—and the state court accepted Burr as a qualified expert—is a valid source of professional norms.  In Texas, "expert testimony of an attorney is necessary to establish this standard of skill and care ordinarily exercised by an attorney."  *Border Demolition & Env't, Inc. v. Pineda*, 535 S.W.3d 140, 158 (Tex. Ct. App. 2017).

The State's argument that "Federal Rule of Evidence 704 does not allow for testimony that tells the trier of fact what result to reach in a case, and it does not allow a witness to give legal conclusions" (Resp. at 34) is beside the point because Harris did not offer Burr for this purpose.  Burr was offered and allowed "to testify regarding what trial counsel should have done," "about the applicable standards of attorney competence" in the relevant time and place including "that trial counsel should develop evidence if there is an indication of drug abuse or mental health problems."  *Earp v. Cullen*, 623 F.3d 1065, 1073 (9th Cir. 2010).  Burr's testimony was evidence of professional norms that was

18

relevant, and the Court should have considered it, particularly absent

contrary evidence from the State.

## IV. The State misapplies the Supreme Court's prejudice standard because it misstates Texas capital sentencing law.

In addressing the prejudicial effect of trial counsel's

ineffectiveness, the State does not deny that the district court

misapplied *Thornell v. Jones*, 602 U.S. 154 (2024).  First, the State is

wrong that Harris waived this argument.  The State argues that Harris

waived this argument because

> in his federal habeas petition, Harris acknowledged the
> proper standard for assessing prejudice in the IATC-
> punishment-phase context was: 'To determine whether a
> petitioner was prejudiced during the punishment phase of a
> capital trial, a court must reweigh all the evidence in
> aggravation against the totality of available mitigating
> evidence (had trial counsel chosen a different course).

Resp. at 37 (citing ROA.115–16).  This summary is consistent with

Harris's current position as will be plain from the discussion below.  In

the district court, Harris's habeas counsel obviously used "reweigh all

the evidence" in the same colloquial sense as the Texas Court of

Criminal Appeals used "weigh all the evidence" in deciding punishment

in *Mosley v. State*, 983 S.W.2d 249, 263 (Tex. Crim. App. 1998); *see infra*

p. 23.  Despite use of the word "weighing" or "reweighing," nobody

disputes that Texas is a non-weighing state.  In the district court, Harris's counsel, like the *Mosley* court, used "weigh" informally—not in the sense of a structured balancing test between statutorily-defined aggravating and mitigating factors as seen in jurisdictions such as Arizona.  *See Mosley*, 983 S.W.2d at 260, 263.

Moreover, regardless of any colloquial use of these words by Texas courts or Harris's counsel in the district court, the mechanics of reconsidering the totality of the evidence in a non-weighing state do differ from a weighing state—whatever the State may argue.

There is no dispute that *Jones* held that in assessing mitigating evidence, a habeas court must apply the governing state-law framework for considering aggregating factors and mitigating factors.  *Jones*, 602 U.S.  at 159.  The State also does not deny that the district court incorrectly applied the Arizona-law balancing test from *Jones*, weighing aggravating factors against mitigating factors.  ROA.509 ("'[W]here the aggravating factors greatly outweigh the mitigating evidence, there may be no 'reasonable probability' of a different result.'") (quoting *Jones*, 602 U.S. at 165).

The State also does not deny the distinction between Arizona and Texas law—Arizona is a weighing state and Texas is a non-weighing state. *See Ex parte Gonzales*, 204 S.W.3d 391, 393–94 (Tex. Crim. App. 2006); Harris's Br. at 55-56; *infra* pp. 22-23.

Instead, the State argues that there is no meaningful difference between Arizona and Texas law in this regard. And in doing so, the State both mischaracterizes Harris's argument and misstates Texas capital sentencing law. Contrary to the State's characterization, Harris does not argue that a factfinder in Texas may only consider mitigating evidence or that aggravating evidence must be "disregarded." Resp. at 37. Nor does Harris propose that a court evaluating prejudice under *Strickland* must ignore the State's case in aggravation. *Id.* Rather, Harris accurately describes that Texas employs a non-weighing capital sentencing scheme, in which

> the jury must find the existence of one aggravating factor before imposing the death penalty, but aggravating factors as such have no specific function in the jury's decision whether a defendant who has been found to be eligible for the death penalty should receive it under all the circumstances of the case.

*Stringer v. Black*, 503 U.S. 222, 229-30 (1992).

## A.    The State misrepresents Harris's argument.

Harris does not argue that the factfinder may consider "only" mitigating evidence, as the State claims.  Instead, Harris contends—correctly—that in Texas, once a defendant is eligible for death, the jury is asked to determine only whether sufficient mitigating circumstances exist to warrant a life sentence.  This inquiry is comprehensive and not a mechanical balancing of aggravating and mitigating factors.  A habeas court must consider the "totality of the applicant's mitigating evidence if a jury had the opportunity to evaluate it again," whether "the applicant's available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of the applicant's moral culpability."  *Gonzales*, 204 S.W.3d at 399; Harris's Brief at 55-56; *infra* pp. 30-31.

> The Texas mitigation special issue asks as follows:
>
> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).

The State attempts to collapse the distinction between weighing and non-weighing jurisdictions by quoting language from *Mosley*, 983 S.W.2d at 263, suggesting that Texas jurors "weigh all evidence" in deciding punishment. But this paraphrasing misleads. There is no question that Texas's scheme does not involve rigid or formal balancing as in balancing states; a juror is free to consider the "morality" of sentencing the defendant to death based on the totality of the evidence. In *Gonzales*, the Texas Court of Criminal Appeals made this explicit: "Texas' capital sentencing scheme does not involve the direct balancing of aggravating and mitigating circumstances." 204 S.W.3d at 394. The *Mosley* court used "weigh" informally—not in the sense of a structured balancing test between statutorily-defined aggravating and mitigating factors as seen in jurisdictions such as Arizona. *See id.; Mosley*, 983 S.W.2d at 263.

As the Supreme Court clarified in *Stringer*, in a weighing state, the sentencer "must weigh the aggravating or factor or factors against the mitigating evidence." 503 U.S. at 229. In a non-weighing state like Texas, aggravating factors serve only to make a defendant eligible for the death penalty and not to determine the punishment. "[T]he

factfinder takes into consideration all circumstances before it…. These circumstances relate both to the offense and the defendant." *Id.* at 230.

Similarly, in *Clemons v. Mississippi*, 494 U.S. 738 (1990), the Court explained that in non-weighing schemes, "aggravating circumstances serve only to make a defendant eligible for the death penalty." *Id.* at 744-45.

In Texas, prejudice turns not on whether new mitigation outweighs aggravation, but on whether the new evidence could have moved at least one juror to find sufficient reason for a life sentence. *Canales v. Davis*, 966 F.3d 409, 412 (5th Cir. 2020) ("To determine whether Canales has made the requisite showing, we must ask whether under Texas's capital sentencing statute, the additional mitigating evidence is so compelling that there is a reasonable probability that at least one juror could have determined that because of the defendant's reduced moral culpability, death is not an appropriate sentence.") (internal quotation marks and brackets omitted).

**B.** **Had it been presented at trial, Harris's mitigation evidence would likely have spared him the death penalty.**

Here, unlike in *Jones*, Harris has substantial, new mitigating evidence that, taken as a whole, "'might well have influenced the jury's appraisal' of the applicant's moral culpability." *Gonzales*, 204 S.W.3d at 399 (citation omitted). In *Jones*, the Supreme Court concluded, "Most of the mitigating evidence Jones presented at the federal evidentiary hearing was not new, and what was new would not carry much weight in Arizona courts." 602 U.S. at 165. Here, Harris's claim differs from Jones's in that all mitigating evidence Harris offered was new. Moreover, under Texas's non-weighing framework, the new evidence would have radically altered the overall balance of factors affecting the jury's decision whether to impose the death penalty.

**1.** **Harris's objective brain damage is uncontested and confirmed by an MRI.**

Dr. Travis Snyder, a neuroradiologist, showed that Harris has a cavum septum pellucidum, a marker of abnormal fetal brain development. ROA.27886. Dr. Jeffrey Lewine, a neuroscientist, showed that Harris's brain was undersized across multiple regions, particularly the temporal, parietal, and occipital lobes and the left hippocampus.

ROA.27888.  Dr. Joseph Wu concluded these abnormalities were

consistent with FASD, lead poisoning, and traumatic brain injury.

ROA.27924.  He also noted a significantly reduced caudate volume—one

of the clearest neuroimaging signatures of FASD.  ROA.27921.

### 2.    Harris suffers from Fetal Alcohol Spectrum Disorder.

Dr. Julian Davies of the University of Washington's FASD clinic

diagnosed Harris with alcohol-related neurodevelopmental disorder

(ARND), a form of FASD that causes executive dysfunction and

cognitive impairment.  ROA.27950–55; ROA.27959–72.

Dr. Joan Mayfield testified that she reviewed the cognitive tests

McGarrahan performed on Harris before trial, and that the results

show significant impairment strongly indicating FASD—including a 15-

point verbal/performance IQ split, poor results on the Wisconsin Card

Sorting Test, and deficits on the Wechsler Memory Scale.  ROA.22480–

504; ROA.22518–35.  Fewer than 1% of individuals score as poorly as

Harris on some of these measures.  ROA.22493.

### 3. Harris suffered brain damage from toxic lead exposure.

Dr. Thomas Dydek, a toxicologist, testified that Harris was exposed to high levels of lead in utero and as a child. ROA.22209–22227; ROA.25307. Harris's mother's bone-lead concentration, tested at Mount Sinai Hospital, was roughly 30% higher than average. ROA.27878. Texas officials refused Harris transport for similar testing. ROA.22465–22466.

### 4. Harris experienced severe abuse and neglect.

Dr. Laura Sovine developed Harris's psycho-social history and documented extreme early-life trauma. ROA.21981; ROA.22069; ROA.22653; ROA.25380. His mother drank and used drugs during pregnancy. ROA.21977; ROA.25382. She was bipolar, emotionally unavailable, and failed to form an attachment with him—which is vital for brain development. ROA.22654–655; ROA.25385. Harris was beaten, sexually abused, and witnessed domestic violence throughout childhood. ROA.21988–992; ROA.22766–67; ROA.25387. Police were called to the home at least 15 times. *Id.*

Public school records classified Harris with "Learning Disabilities/Emotional Behavior Disorders." ROA.25403; ROA.25673–

886.  He was placed in special education until he dropped out in 11th

grade.  ROA.25404.  From age 7, Harris talked about killing himself.

ROA.22420–21.  He heard voices (ROA.22413; ROA.22771), was never

given psychiatric care (ROA.22420–22421), and was denied ADHD

medication.  ROA.25328.

By his teens, Harris was homeless and preferred incarceration to

living at home.  ROA.25400–04.  His probation officer noted that no

parent or guardian was providing adequate care.  ROA.25401.

### 5.    Harriss's mitigation evidence could have led one juror to choose life.

The new evidence offered by Harris is precisely the type of

evidence the U.S. Supreme Court has found prejudicial when omitted.

*See Wiggins*, 539 U.S. at 535 (failure to present childhood abuse and

neglect was prejudicial); *Porter v. McCollum*, 558 U.S. 30, 41–43 (2009)

(failure to present trauma, brain damage, and mental health evidence

was prejudicial); *Rompilla*, 545 U.S. at 393  (failure to present evidence

of mental impairments and family dysfunction was prejudicial).

Texas jurors are expressly instructed to consider "personal moral

culpability."  Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).  Evidence of

FASD, neurological damage, and a history of unrelenting abuse and neglect bear directly on that inquiry.

Under Texas's non-weighing scheme, the sentencing decision is a moral judgment, not a comparative exercise. *See Gonzales*, 204 S.W.3d at 394. The newly presented mitigation—rooted in medical imaging, toxicology, neuropsychology, and social history—could have led at least one juror to vote for life. That is sufficient to establish *Strickland* prejudice.

### 6. Under Texas's non-weighing framework, the district court cannot summarily dismiss Harris's new mitigation evidence as "weak."

A habeas court reviewing a *Strickland* claim must evaluate whether there is a reasonable probability that the new mitigating evidence would have changed at least one juror's sentencing decision— not whether it is more likely than not that the outcome would have changed. The U.S. Supreme Court has made clear that this is a lower threshold than a preponderance standard:

> *Strickland* held that to prove prejudice the defendant must establish a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different'; it specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered.

*Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) (per curiam) (internal citations omitted); *see also Strickland*, 466 U.S. at 694.

Accordingly, the burden is not on the petitioner to show that the new mitigation would have "overcome" the aggravating evidence in the jury's view or that it "certainly" would have changed the outcome—but simply that there is a reasonable probability that it could have. *Canales*, 966 F.3d at 412 (Texas's capital sentencing statute requires the habeas court to ask whether "the additional mitigating evidence [is] so compelling that there [is] a reasonable probability that at least one juror could have determined that because of the defendant's reduced moral culpability, death is not an appropriate sentence") (citation omitted).

The State argues that the district court properly found that Harris's new mitigating evidence was "weak" compared to aggravating factors. *See* Resp. at 42-43. The district court should not have summarily dismissed Harris's new mitigation evidence as "weak;" *Strickland* requires that prejudice be determined in light of the totality of the mitigation case. *See Porter*, 558 U.S. at 41 ("a reviewing court must consider the totality of the available mitigation evidence"). When

a habeas petitioner presents uncontroverted, substantial, and detailed new mitigating evidence—such as expert diagnoses, brain imaging, social history, and cognitive testing—that was not before the jury, a court cannot dismiss it as "weak" or "unpersuasive." Here, instead of lining up aggravating factors against mitigating factors, the district court should have made factual findings that address whether the new evidence could have influenced at least one juror. *See id.*

Moreover, in cases involving factual disputes, credibility determinations, and complex expert evidence (as here), a habeas court should allow the jury to evaluate the new evidence. *See Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995) ("A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.").

Harris presented expert-supported evidence of FASD, neurological damage, toxic exposure, and severe childhood abuse—none of which was meaningfully investigated or presented at trial—and the habeas courts should not have deferred to the State's characterization of that evidence as "weak" without explaining why, in light of the full record and

31

applicable standards.  The prejudice rule that applies here requires

habeas courts to engage with the new evidence, and the correct

standard is whether it reasonably could have changed the result—a

showing Harris has clearly made.

**V.    Trial counsel's decision to introduce evidence that Harris was wearing a stun belt was deficient and presumptively prejudicial.**

**A.    Trial counsel's introduction of stun belt evidence was ineffective assistance of counsel.**

Trial counsel Lollar introduced to the jury that the state required

Harris to wear a stun belt.  The State attempts to excuse this

constitutional violation as a strategic decision immune from attack.

This argument fails as a matter of law.  "[C]ourts are 'not required to

condone unreasonable decisions parading under the umbrella of

strategy, or to fabricate tactical decisions on behalf of counsel when it

appears on the face of the record that counsel made no strategic

decision at all.'"  *Nelson v. Davis*, 952 F.3d 651, 672 (5th Cir. 2020)

(citation omitted).  A purportedly "conscious and informed decision on

trial tactics and strategy" cannot be "the basis of constitutionally

ineffective assistance of counsel" where "it is so ill chosen that it

permeates the entire trial with obvious unfairness." *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) (citation omitted).

This was not a reasonable strategic choice. It was a prejudicial error that inevitably permeated the entire sentencing.

## B.    The stun belt testimony was inherently prejudicial.

The State claims the introduction of evidence that Harris was wearing a stun belt was harmless. It was not. The Supreme Court has explicitly held that visible restraints are "inherently prejudicial." *Deck*, 544 U.S. at 635 (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986)). "That statement"—that shackling is "inherently prejudicial"— "is rooted in our belief that the practice will often have negative effects, but—like 'the consequences of compelling a defendant to wear prison clothing' or of forcing him to stand trial while medicated—those effects 'cannot be shown from a trial transcript.'" *Id.* (quoting *Riggins v. Nevada*, 504 U.S. 127, 137 (1992)). "Thus, where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation." *Id.* "The State must

prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained." *Id.*

Courts regard a stun belt as the same as shackling: "a decision to use a stun belt must be subjected to at least the same close judicial scrutiny required for the imposition of other physical restraints." *United States v. Durham*, 287 F.3d 1297, 1306 (11th Cir. 2002). "Jurors may have thought [the use of a stun belt] evidence that [the defendant] [i]s violent and unpredictable ... encouraging it to sentence such a person, already found to be a murderer, to death." *Stephenson v. Neal*, 865 F.3d 956, 959 (7th Cir. 2017).

That the jury was informed Harris was wearing a stun belt is enough to presume prejudice. It "could instill in the jury a belief that the defendant is a dangerous individual who cannot be controlled, an idea that could be devastating to his defense." *State v. Choice*, 319 S.W.3d. 22, 26 (Tex. Ct. App. 2008) (citation omitted). Therefore, the Court must presume prejudice.

## CONCLUSION

The Court should grant Harris's Motion for a Certificate of Appealability, resolving all doubts as to whether there is a reasonable

possibility that the new mitigating evidence presented may have caused

at least one juror to reject the death penalty.

Respectfully submitted,

/s/ *Gwendolyn C. Payton*

Adam H. Charnes
KILPATRICK TOWNSEND &
  STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
(214) 922-7106

Gwendolyn C. Payton
John R. Neeleman
KILPATRICK TOWNSEND &
  STOCKTON LLP
1420 Fifth Ave., Suite 3700
Seattle, Washington 98101
(206) 626-7714

*Attorneys for Petitioner-Appellant*
*Roderick Napoleon Harris*

## CERTIFICATE OF COMPLIANCE

1.      This reply brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(1) because it contains 6,499 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2.      This reply brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Century Schoolbook 14-point font using Microsoft Word 2016.

DATED: May 30, 2025.

/s/ *Gwendolyn C. Payton*
Gwendolyn C. Payton
KILPATRICK TOWNSEND &
  STOCKTON LLP
1420 Fifth Ave., Suite 3700
Seattle, Washington
(206) 626-7714

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2025, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system, which will provide notification of such filing to all counsel of record.

/s/ *Gwendolyn C. Payton*
Gwendolyn C. Payton
KILPATRICK TOWNSEND &
  STOCKTON LLP
1420 Fifth Ave., Suite 3700
Seattle, Washington
(206) 626-7714